# IN THE UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
# ROANOKE DIVISION

| | | |
|---|---|---|
| XAVIA T. GOODWYN,[1] | ) | Civil Action No. 7:17CV00271 |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| ROOP, *et al.*, | ) | By: Norman K. Moon |
|     Defendants. | ) | Senior United States District Judge |

Xavia T. Goodwyn, a Virginia inmate proceeding *pro se*, filed this civil rights action pursuant to 42 U.S.C. § 1983,[2] naming ten defendants: Roop, R. Adams, J. Roberts, J. Statzer, J.W. Kiser, Shannon K. Hayes, S.B. Franklin, John Messer, Jordan Fleming, and Jerel Dickenson. He asserts the following claims: (1) excessive force against all ten defendants, which includes claims of "bystander liability" based on some unidentified defendants' failure to intervene to stop the use of force; (2) state-law assault and battery claims against defendants Messer, Adams, Roberts, and Statzer; (3) what he calls "assault by agent" claims against defendants Roop, Hayes, and Adams, based on their use of Oleoresin Capsicum ("OC") spray[3] or K-9 dogs against him; and (4) state-law claims of willful and wanton negligence against defendants Franklin, Fleming, Messer, and Dickenson.

Defendants have filed a collective motion for summary judgment, which is ripe for disposition and addressed herein. Upon review of the record, I conclude that defendants' motion for summary judgment should be granted in part and denied in part.

---

[1] In his initial complaint, Plaintiff spelled his name "Goodwin," but I utilize the spelling in his offender records and in his amended complaint, which is Goodwyn. The Clerk is directed to correct the docket accordingly.

[2] I omit internal citations, alterations, and quotation marks throughout this opinion, unless otherwise noted. *See United States v. Marshall*, 872 F.3d 213, 217 n.6 (4th Cir. 2017).

[3] OC spray is a chemical agent similar to what is commonly known as pepper spray or mace and irritates a person's eyes, throat, and nose. *See, e.g., Park v. Shiflett*, 250 F.3d 843, 849 (4th Cir. 2001) (describing the physiological effects of OC spray).

## I.

Goodwyn is a Virginia inmate housed at Red Onion State Prison ("Red Onion"). On December 17, 2015, there was an incident in the A-1 Pod at Red Onion in which multiple offenders were reported to be fighting. Many staff responded to this incident, including two K-9 officers, Roop and Hayes, with their dogs. Goodwyn's claims all arise from events on that date and can be grouped into three categories of allegations by time period: (1) uses of force against Goodwyn in the A-1 Pod itself, during the initial officer response to the fights; (2) uses of force against Goodwyn while he was being transported from the A-1 Pod to various places while restrained; and (3) Goodwyn's placement in ambulatory restraints in a segregated cell for approximately twenty-four hours, without being permitted to decontaminate from the OC spray used on him.

The evidence includes numerous affidavits from defendants and other Red Onion employees (some of which also include exhibits, such as incident reports), as well as an affidavit from Goodwyn and the statements in his verified amended complaint.[4] The record also includes a Rapid Eye video and handheld video from the incident.[5]

At approximately 7:15 a.m. on December 17, 2015, forty-four inmates were released from their cells in the bottom tier of the A-1 Pod at Red Onion, so that they could eat breakfast. Several offenders began fighting with other inmates, and Goodwyn was among them. Goodwyn does not deny that he was fighting with another inmate, and he admits that he had a weapon (a sock filled with bar soap), but he alleges that he complied with all orders immediately following the inmate fights and before any force was used on him. (Am. Compl. ¶¶ 16–18, Dkt. No. 57.) Specifically, he asserts that when ordered to do so, he immediately dropped his weapon and got down on the floor in a prone position. He states that he was being completely compliant and following orders

---

[4] I treat statements in Goodwyn's verified amended complaint, if based on personal knowledge, as evidence in opposition to the summary judgment motion. *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991).

[5] There are actually three handheld video files, as discussed *infra*.

when Roop engaged his assigned dog, Canine Lojzo, on Goodwyn's left leg. He also states that, at about the same time, and while he continued to lie in the prone position and comply with all commands, Adams sprayed him with OC spray. (*Id.* ¶¶ 18–20.)

Shortly after Roop ordered Lojzo to disengage from Goodwyn, a number of officers attempted to place Goodwyn in wrist and leg restraints. They contend that he was not being compliant, and several have testified that Goodwyn kicked repeatedly at one of the officers, Officer Vanover. Goodwyn asserts, however, that he did not kick Vanover at any time nor did he try to. He states instead that he was being compliant with all orders and commands. Goodwyn also claims that at or about the same time, Messer stood on his back such that he could barely breathe.[6] (*Id.* ¶¶ 20–21; Pl.'s Aff. ¶ 3, Dkt. No. 76-1.)

The second time-period occurred while Goodwyn was being transported to several locations, while in wrist and leg restraints. According to him,[7] he was taken first to the A-4, 5 and 6 side of the building to be assessed by medical staff. While he was there, it appears that Ms. Murphy, with the Institutional Investigator's Office, talked to him. He was then taken to A-3, where he was searched. (Am. Compl. ¶¶ 22–27.)

Lastly, he was escorted to B-304, where he was placed in ambulatory restraints per orders of Franklin. (Franklin Aff. ¶ 4, Enclosure A.) Goodwyn was released from ambulatory restraints at approximately 7:30 a.m. on December 18, 2015.

During the course of the transport, Goodwyn alleges that, while he was fully restrained and leaving A-1, Adams kicked or stomped on him. (Am. Compl. ¶¶ 22–23.) He further alleges that

---

[6] Goodwyn's amended complaint asserts that defendant Messer stood on top of him before Roop's canine engaged him (Am. Compl. ¶ 19, Dkt. No. 57), which is flatly contradicted by the Rapid Eye video. Although the events unfolded quickly, when reviewing them frame by frame, it is evident that no officer physically touched Goodwyn before the canine engaged.

[7] It is not entirely clear from defendants' affidavits whether Goodwyn was searched first and then given medical treatment, or vice-versa.

3

after being searched in front of cell A-303 and as they reached the exit to A building, either Roberts or Statzer rammed his head into a steel doorframe, Statzer bent his left wrist backwards closing the restraints tighter on him, and Roberts "held his face aggressively on the right side against the wall" while making racial remarks and threats. (*Id.* ¶ 29.) He also alleges that, at this same time, while he was fully restrained and while Messer, Dickenson, Fleming, Roberts, and Statzer were present, K-9 Officer Hayes engaged his dog on Goodwyn's lower right leg and that they did nothing. (*Id.* ¶ 30.) He also complains that, during this transport, he asked for decontamination repeatedly, because his eyes and face were burning from the OC spray, and that he was repeatedly denied decontamination. (*Id.* ¶¶ 25, 28, 32.) Lastly, he was transported to B-3, where he was placed in ambulatory restraints. On the way there, he alleges that Statzer and Roberts were bending his arms and wrist to cause intentional pain. (*Id.* ¶ 31.)

The third time period involves his time in ambulatory restraints in a segregation cell, in which he repeatedly requested that he be allowed decontamination because his eyes and face were burning, but he was instead held for 24 hours in a cell without soap, water, or toilet paper. While held in that room, a nurse came to change his dressings at 3:00 p.m., and noted that he had additional puncture wounds on his right leg that were bleeding that she had not seen before. Franklin was the person who approved the use of ambulatory restraints on Goodwyn. As discussed in more detail below, Goodwyn alleges that he complained to Kiser several times while being held in the cell about the effects of the OC spray, and that one of those times Kiser said he would help him, but Kiser never took any action.

Defendants have provided affidavits painting a different picture, and they dispute much of Goodwyn's account. As to events in the A-1 Pod, Roop states that he ordered Goodwyn to stop fighting with offender J. Sheldon and he issued several warnings for them to stop. According to Roop, Goodwyn failed to comply and so Roop engaged his canine on Goodwyn's left calf. It was at

4

that point that Goodwyn complied with orders to stop fighting and got on the ground. Roop therefore commanded Lojzo to disengage Goodwyn, which the canine promptly did. (Roop Aff. ¶¶ 5–6, Dkt. No. 39-1.)

Adams alleges that he was commanding Goodwyn to stop fighting, but Goodwyn was non-compliant and, due to that non-compliance and "with the sole purpose of ending the offender altercations for the safety of both staff and offenders," he utilized the OC spray on Goodwyn. (Adams Aff. ¶ 6, Dkt. No. 39-2.)

A number of the officers also testified that Goodwyn was kicking at Officer Vanover as others were trying to place restraints on Goodwyn. (*See, e.g.*, Adams Aff. ¶ 5; Messer Aff. ¶ 4, Dkt. No. 64-4; Roberts Aff. ¶ 4, Dkt. No. 50-1.) Adams began restraining Goodwyn's hands, while Officer Vanover attempted to place leg restraints on him. They assert that Goodwyn continued to be combative, rolled over on his back, and kicked Officer Vanover several times. Messer then came to assist with restraints. Messer denies standing on Goodwyn's back, but states that he kneeled on Goodwyn's back while the officers were attempting to restrain him. (Messer Aff. ¶ 4.) He claims that he did so only to gain control of Goodwyn so he could be restrained. (*Id.* ¶ 4.) Roberts and Statzer assisted in controlling Goodwyn while the other officers placed him in restraints.

Turning to the events during transport, Messer states that Goodwyn became combative again while being transported and so he was placed on the ground outside of A-303 until control could be regained. (*Id.*) Roberts states that he assisted in holding Goodwyn against the wall for a period while he was searched, but did not slam his head against the wall or threaten him. (Roberts Aff. ¶ 4.)

The rest of the alleged misconduct is flatly denied by defendants.[8] Specifically, they deny

---

[8] Goodwyn also alleges that, at various points during the transport, officers made threats and racial remarks toward him. He also claims that after he spoke with Investigator Murray and she left the room, defendant Roberts said, "The only person who can save you just left." (Am. Compl. ¶ 26.) Even if true, such statements by defendants do not

5

trying to kick or stomp Goodwyn, slamming his head against a doorframe, and Hayes denies engaging his canine on Goodwyn at any point. They also argue that the uses of force they admit to were justified by Goodwyn's repeated noncompliance.

With regard to the decontamination, defendants' affidavits are inconsistent on this issue. At least one says Goodwyn was offered and refused decontamination. (Adams Aff. ¶ 5.) Another said that Goodwyn continued to be non-compliant and combative and suggests that he could not be decontaminated. (Messer Aff. ¶ 5 (explaining that the priority for an offender who is combative and resisting staff is to get the offender to a secure area).)

The medical records reflect that when Goodwyn was first evaluated in the vestibule area of the housing unit, he stated, "I can't breathe," but the nurse noted that he had no respiratory distress. The nurse noted a small amount of blood on his lip and a dog bite to the lower left leg, which was treated and dressed. At 3:00 p.m. the same day, medical staff was called to change the dressing on Goodwyn's left leg. While doing so, she saw blood on his right leg and noted three puncture wounds to the right leg. The nurse notified the watch office. (Bledsoe Aff. ¶¶ 4–5.) On December 18, 2015, he received x-rays on both his left wrist and his right ankle. The x-rays did not reveal any fractures or dislocation in either location, although the reports stated that his right ankle was swollen. (Med. Records 8–9, Dkt. No. 76-1.)

As I noted above, there are videos of some of the relevant time-frame, consisting of Rapid-Eye video footage before, during, and after the fighting in A-pod, and handheld video footage taken for a portion of the time Goodwyn was being transported and afterward. Both Goodwyn and defendants generally assert that these videos support their versions of events. I find, however, that the videos are generally inconclusive as to the main disputes of fact in the case.

---

give rise to a constitutional violation. *Henslee v. Lewis*, 153 F. App'x 179, 179 (4th Cir. 2005) ("Mere threats or verbal abuse by prison officials, without more, do not state a cognizable claim under § 1983.").

First of all, the Rapid Eye video is not a continuous recording of events; instead, by its very nature, it contains gaps. Moreover, the events during the altercation in the pod unfolded relatively quickly. Only two of the three views available contain portions of the relevant events.

The first, the view labeled "PTZ," has big gaps as to what is happening to Goodwyn because it was being manually controlled for much of the relevant time period. Nonetheless, for the time that the camera shows him or portions of him, the view is inconclusive as to whether Goodwyn is complying with orders before Roop engaged Lojzo on Goodwyn's leg or before Adams used OC spray on him.[9] That view is also inconclusive as to whether Goodwyn was compliant after the dog disengaged. At one point, it appears that the top half of Goodwyn's body looks like it is going into (or coming out of) a push-up type-stance, so he *might be* attempting to get up. At another point, there is one frame where an officer appears to be kneeling on Goodwyn's legs and it does appear that Goodwyn's left foot is off the ground. That is the only even limited visible evidence that Goodwyn may have tried to kick anyone. But overall, the view is simply inconclusive as to what is happening and whether Goodwyn was being compliant or not.

The second view, labeled "A1 Pod Left" is a much wider view, so Goodwyn's location is in view at all times, albeit from a distance. Zooming in to see events sacrifices clarity. It appears from that view that Goodwyn did not lie down as quickly as other offenders but again, it is inconclusive as to whether Goodwyn was being compliant before force was applied.

The handheld video evidence, which consists of three different video clips, is similarly unhelpful to a resolution of the disputed issues. The lengthiest clip begins showing Goodwyn being held tightly against a doorframe, surrounded by four officers, and it appears that they are all in a small room that leads immediately to the exit of A building. You cannot see Goodwyn the entire

---

[9] Complicating the latter inquiry is the fact that the video depicts an officer approaching with what appears to be the OC spray held in front of him, but it is not possible to tell at what point he actually uses it.

7

time, and there are moments where it appears that he (or someone else) is crying out in pain. It then shows Goodwyn's transport from A building to B building, and shows him being placed in ambulatory restraints and placed in Cell B-303. Because it does not show anything that occurred before that time (or show how Goodwyn came to be held against the doorframe), it neither proves nor disproves most of the uses of force alleged by Goodwyn during the transport.

Likewise, although Goodwyn refers to the handheld video footage as evidence that Hayes engaged his K-9 on plaintiff's lower right leg while he was fully restrained, the handheld video does not show that incident occurring. But the time period in which Goodwyn alleges it occurred—shortly before leaving the A building—was not all recorded.[10] According to him, he was slammed into a doorframe and Hayes engaged his canine on his leg *prior* to his departure to the B building. Thus, the video does nothing to disprove his allegations. The events alleged by him could have immediately preceded the video.

Even during that portion of the transport that is on the video, moreover, the camera does not stay on Goodwyn the entire time. It is impossible to tell whether anyone is kicking him, nor can you see how the officers are holding him for most of the time he is walking or whether they are bending back his wrists, as he alleges.

The other two videos are much shorter. The first is taken the morning after the fight, at approximately 6:55 a.m. It shows a nurse assessing Goodwyn, while he is still in ambulatory restraints, through the small glass window in the cell door. Goodwyn's portion of the conversation is not audible, but a guard and a nurse are present and their comments suggest that Goodwyn requested x-rays for his ankle and wrist, but otherwise told them he was okay and did not request

---

[10] To the extent that he claims that this occurred after he was seen and treated by medical staff, there is some support for that in his medical records, in which a bite mark on his left leg was noted, treated, and dressed on that leg shortly after the incident. Then, as noted, the nurse observed, at 3:00 p.m. the same day, three puncture wounds on his right leg, which were bleeding and which had not been observed before.

8

any other treatment. This, of course, tends to undermine his claim that the OC continued to cause him significant pain while he was held in ambulatory restraints.

The third video shows his ambulatory restraints being removed the morning of December 18, 2015. It is irrelevant as to whether force was used or whether Goodwyn was being compliant during earlier events, but it does show that Goodwyn appears to be having pain in his right ankle or leg.

Based on his conduct, Goodwyn received several disciplinary charges. (Counts Aff. ¶ 5, Dkt. No. 39-4.) He accepted the penalty offer for all three, and the forms indicate that accepting the penalty offer is an admission of guilt. This included accepting a penalty offer for aggravated assault on a non-offender, which states that "Goodwyn struck Officer Vanover in the leg numerous times." (Counts Aff. ¶ 5–7 and Enclosure D.)[11]

## II.

Under Rule 56, summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists only where the record, taken as a whole, could lead a reasonable jury to return a verdict in favor of the nonmoving party. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009). In making that determination, I must take "the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc).

A party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Moreover, "[t]he mere existence of

---

[11] As noted, Goodwyn flatly denies kicking Vanover in sworn testimony in this case. Thus, although his acceptance of the disciplinary charges likely has some bearing on Goodwyn's credibility, it alone cannot completely defeat his version of events.

*some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247–48. Instead, the non-moving party must produce "significantly probative" evidence from which a reasonable jury could return a verdict in his favor. *Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 924, 930 (4th Cir. 1990) (quoting *Anderson*, 477 U.S. at 249–50).

## III.

As noted, Goodwyn alleges claims of excessive force, bystander liability, and state law torts, including assault, battery, and willful and wanton negligence. I conclude that material disputes of fact exist as to these claims and, therefore, will deny summary judgment as to all claims except for Goodwyn's claims for damages against defendants in their official capacities.

### A. Official Capacity Damages

As a preliminary matter, defendants correctly note that Goodwyn cannot obtain money damages from defendants in their official capacities under § 1983, which is the vehicle for his excessive force and bystander liability claims. Section 1983 permits an aggrieved party to file a civil action against a person for actions taken under color of state law that violated his constitutional rights. *See Cooper v. Sheehan*, 735 F.3d 153, 158 (4th Cir. 2013). "[N]either a State nor its officials acting in their official capacities are 'persons' under § 1983." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). Thus, I will grant defendants' motion for summary judgment as to Goodwyn's § 1983 claims for money damages against defendants in their official capacities.

### B. Excessive Force Claims

The Eighth Amendment prohibits prison officials from inflicting unnecessary and wanton pain and suffering on prisoners. *Whitley v. Albers*, 475 U.S. 312, 320 (1986). To succeed on an excessive force claim, a plaintiff must show that the prison official (1) used "nontrivial" force (objective component), *Wilkins v. Gaddy*, 559 U.S. 34, 39 (2010), and (2) acted with "wantonness

in the infliction of pain" (subjective component), *Whitley*, 475 U.S. at 322. In the prison context, analysis of the subjective component "ultimately turns on whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian*, 503 U.S. 1, 6 (1992). Whether the force was necessary or intentionally aimed at inflicting unnecessary physical harm depends on factors such as the need for the application of force, the relationship between the need and the amount of force used, the extent of injury inflicted, the extent of the threat to the safety of staff and inmates reasonably perceived by responsible officials, and any efforts made to temper the severity of a forceful response. *Whitley*, 475 U.S. at 321; *see Wilkins*, 559 U.S. at 34.

As noted, and viewing the facts in the light most favorable to Goodwyn, I conclude that a reasonable jury could credit Goodwyn's account of the instances of excessive force. In some cases, the available video evidence might so completely contradict the plaintiff's version that it could overcome his sworn assertions. *Scott v. Harris*, 550 U.S. 372, 380 (2007). That is, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* at 380. Applying that principle, the Fourth Circuit noted in *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008), that where "the record contains an unchallenged videotape capturing the events in question, we must only credit the plaintiff's version of the facts to the extent it is not contradicted by the videotape." Here, as noted above, the videos either do not capture the entirety of events at issue or are otherwise inconclusive. In short, the available video evidence does not "blatantly contradict" Goodwyn's version of events. *Cf. Scott*, 550 U.S. at 380. Thus, the version of events in his verified complaint and affidavit must be credited for summary judgment purposes.

Goodwyn's testimony is that he was fully compliant with all instructions before any force

11

was applied to him in the A-1 pod. If that were the case, then the alleged uses of force against him here (Roop engaging his canine, Adams spraying him with OC spray, Messer standing on his back) could be found to be excessive.

The overall situation facing the officers, which involved a large number of inmates out of their cells and multiple inmates engaged in fights, certainly could have warranted generally the use of some force. However, the need for the application of force, once there are numerous officers present and all (or nearly all) of the offenders are lying prone on the ground is lessened. Moreover, the need for the application of force against an inmate who is complying with orders and lying face-down on the ground without a weapon, is minimal. In that circumstance, a jury could find that engaging a canine, spraying the inmate with OC spray, or standing on the inmate's back, all could be found to be excessive in relation to the need for force. *See, e.g.*, *Iko*, 535 F.3d at 239–40 (holding that using pepper spray on an inmate attempting to comply with orders could be disproportionate to the need for force).

Similarly, after Goodwyn was restrained in both wrist and leg restraints, he has testified that he was being fully compliant. Despite this, Goodwyn alleges that either Roberts or Statzer slammed him into a doorframe, Statzer bent his wrist backward, causing him pain, Adams kicked or stomped him, and that Hayes engaged his canine on Goodwyn while Dickenson, Fleming, Roberts and Statzer stood by and failed to intervene. Again, a jury could conclude that there was no need for those types of force on a fully restrained, compliant inmate, and that the threat to safety of staff and inmates was minimal.

There are disputes of fact, therefore, as to Goodwyn's excessive force claims against defendants based on these events. Accordingly, I will deny defendants' motion for summary judgment as to the Section 1983 individual capacity claims against Roop, Adams, Messer, Roberts, Statzer, and Hayes.

C.  **Bystander Liability Claims**

Under the theory of bystander liability, an officer may be liable if he or she: "(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *Randall v. Prince George's Cty.*, 302 F.3d 188, 204 (4th Cir. 2002).

With regard to the bystander liability claims, defendants argue that there can be no bystander liability because no excessive force was used and no defendants had any knowledge of any excessive force. Although defendants make a passing reference to the second element of the claim (that the defendant must have a reasonable opportunity to prevent the harm), they do not offer any specific argument as to why any defendant did not have a reasonable opportunity to intervene, either during the uses of force in the A-pod or when Hayes allegedly engaged his canine on Goodwyn while he was fully restrained. Instead, their argument is premised on the fact that no excessive force was used and that none of them knew of any constitutional violation. Because I have already concluded that disputes of fact exist as to whether excessive force was used, however, their argument fails. Accordingly, I will also deny summary judgment as to the bystander liability claims.

D.  **Claims Against Kiser and Franklin**

The remaining two defendants are Franklin and Kiser. Franklin was the person who ordered that Goodwyn be placed in ambulatory restraints. Kiser was one of the guards who Goodwyn asked for help while he was in ambulatory restraints. Specifically, Goodwyn alleges that Kiser came to check on Goodwyn while he was in ambulatory restraints in a solitary cell. He states that he complained to Kiser that his face and eyes were still burning from the OC spray and that he was never given an opportunity to decontaminate. Kiser simply responded that Goodwyn should "get comfortable" because he would "be [there] for a while." (Am. Compl. ¶ 34.) Later he alleges that,

13

when he complained again to Kiser in front of an investigator, Kiser said he would "take care" of the problem, but he never did. (*Id.*)

Although Goodwyn lumps his claims against Kiser and Franklin with his other claims under the heading of "excessive force," his claims are more properly analyzed as claims that his conditions of confinement constituted cruel and unusual punishment. The Eighth Amendment "protects inmates from inhumane treatment and conditions while imprisoned." *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). "Prison officials are, therefore, obligated to take reasonable measures to guarantee inmate safety." *Makdessi v. Fields*, 789 F.3d 126, 132 (4th Cir. 2015). "For a claim based on a failure to prevent harm, the [prisoner] must [first] show that he was incarcerated under conditions posing a substantial risk of serious harm." *Id.* Next, the prisoner must establish that the prison official had "a sufficiently culpable state of mind," that is, "deliberate indifference to [the] inmate['s] health or safety." *Id.*

A prison official "is deliberately indifferent to a substantial risk of harm to a [prisoner] when that [official] knows of and disregards the risk." *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 302 (4th Cir. 2004) (internal quotation marks omitted). However, "prison officials may not simply bury their heads in the sand and thereby skirt liability" by claiming that they were not aware of the risk. *Makdessi*, 789 F.3d at 129. Finally, the prisoner must establish that the prison official's deliberate indifference caused his injury.

In *Makdessi*, the court emphasized that "deliberate indifference" is more than ordinary negligence, but "less than acts or omissions [done] for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 133 (quoting *Farmer v. Brennan*, 511 U.S. 825, 835 (1994)). Furthermore, an officer's "knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that a risk was

14

obvious." *Farmer*, 511 U.S. at 842.

      Here, I conclude that there are disputes of fact precluding summary judgment on the claims against Kiser and Franklin. First, as to Kiser, and construing all facts in Goodwyn's favor, Goodwyn twice complained that he had not been decontaminated to Kiser, and told him he was in significant pain and that his skin felt like it was burning. Kiser did nothing. Also, although Kiser and other defendants assert that there was water in Goodwyn's cell that he could have used to wash off, Goodwyn disputes this. He avers that there was no water or soap available to him. Additionally, it appears that there is at least a general policy that offenders sprayed with OC spray are offered an opportunity for decontamination. Goodwyn's complaints of pain and burning coupled with the general policy of offering contamination to prevent negative effects from OC spray, could allow a jury to find that Kiser knew of a substantial risk to Goodwyn. Also, Goodwyn asserts that Kiser did nothing in response. Based on all of these facts, a jury could find that leaving him in the cell in ambulatory restraints for 24 hours without an ability to decontaminate, after Goodwyn twice reported his complaints of pain, constituted deliberate indifference on Kiser's part. *See Blount v. Farmer*, No. 7:14CV00418, 2015 WL 4404810, at *3–4 (W.D. Va. July 17, 2015) (denying summary judgment on similar facts). Thus, I conclude that genuine issue of material fact remain in dispute for trial, including the extent of Goodwyn's purported pain and other symptoms, Kiser's awareness of a significant risk of serious harm without decontamination, and the reasonableness of his response.

      The analysis as to Franklin is similar. I note that other judges of this court have held that the temporary use of ambulatory restraints on a prisoner, even if he was not disruptive after being placed in those restraints, did not constitute excessive force given the de minimis nature of the inmate's injuries. *Holley v. Johnson*, No. 7:08CV00629, 2010 WL 2640328, at *13 (W.D. Va. June 30, 2010) (concluding that an approximately 48-hour period in ambulatory restraints resulting in

15

swelling that went away within two or three days did not state an Eighth Amendment conditions claim); *see also Canada v. Mathena*, No. 7:13-cv-00322, 2014 WL 3748300, at *4 (W.D. Va.), *aff'd*, 589 F. App'x 121 (4th Cir. 2014) (following *Holley* and granting summary judgment for defendants under similar facts because the prisoner did not claim that the restraints "caused any pain or injury to him"). Here, however, those restraints were used in a circumstance where, at least according to Goodwyn, he had fought with another inmate, but had otherwise been compliant and non-disruptive *before* being placed in the restraints. Moreover, he had repeatedly asked to be decontaminated from the OC spray on his face and eyes, but was denied that opportunity and instead held in a cell where (at least according to him) he had no water, soap, or paper, and was unable to wash himself. I find that a jury could conclude, based on that combination of factors, that Franklin, too, may have shown "deliberate indifference" toward Goodwyn's health or safety.

### E. State-law Claims

As to the state-law claims, defendants assert that they fail for the same reasons that the Section 1983 claims fail. (Dkt. No. 68 at 20.) For the same reasons that I deny summary judgment as to the Section 1983 claim, I likewise deny summary judgment as to the state-law claims.

### F. Qualified Immunity

Defendants also seek qualified immunity but, again, they do so on the ground that "none of the defendants violated Goodwyn's constitutional rights." (Dkt. No. 68 at 19.) The doctrine of qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The burden of proof is on the party seeking qualified immunity. *Wilson v. Prince George's Cty., Md.*, 893 F.3d 213, 219 (4th Cir. 2018).

In determining whether an official is entitled to summary judgment on the basis of qualified

immunity, courts engage in a two-pronged inquiry. *Smith v. Ray*, 781 F.3d 95, 100 (4th Cir. 2015). The first prong asks whether the facts, taken in the light most favorable to the party asserting the injury, show the defendant's conduct violated a constitutional right. *Id.* (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). The second prong asks whether the right was "clearly established" at the time of the defendant's conduct. *Id.* If the answer to either prong is "no," the official is entitled to qualified immunity.

I have already concluded that there are material disputes of fact as to whether or not there was a violation of Goodwyn's constitutional rights. As to the second prong of qualified immunity, I also conclude that, if events unfolded exactly as Goodwyn alleges, then there are at least disputes of fact as to whether the unlawfulness of the action would have been apparent to a reasonable officer, *i.e.*, clearly established. Accordingly, defendants are not entitled to summary judgment on qualified immunity grounds.

An appropriate order will be entered.

**ENTER**: This __19th__ day of August, 2019.

*[signature: Norman K. Moon]*
NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE