IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| XAVIA T. GOODWYN, | ) | Civil Action No. 7:17-cv-00271 |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | ON BENCH TRIAL |
| | ) | |
| ROOP, *et al.*, | ) | By: Joel C. Hoppe |
|     Defendants. | ) | United States Magistrate Judge |

      Xavia T. Goodwyn, a Virginia prisoner appearing *pro se*, filed this suit under 42 U.S.C.

§ 1983, asserting that various defendants violated his Eighth Amendment rights on December 17,

2015, while he was housed at Red Onion State Prison ("Red Onion"). (Am. Compl., Dkt. No.

57.) The matter is before me for a bench trial and Report and Recommendation on the merits of

Goodwyn's excessive force claims, bystander liability claims, and state tort claims. (*See* Dkt.

No. 52.) Specifically, Goodwyn asserts Eighth Amendment claims against all ten defendants:

Roop, R. Adams, J. Roberts, J. Statzer, J.W. Kiser, Shannon K. Hayes, S.B. Franklin, John

Messer, Jordan Fleming, and Jerel Dickenson, most of which are excessive force claims. Some

of the claims are based on so-called "bystander liability," which can be imposed in some

circumstances where a defendant fails to intervene to stop the unconstitutional use of force by

another. The claims against Kiser and Franklin (which arise from Goodwyn's placement in

ambulatory restraints) could also be characterized as claims that his conditions of confinement

constituted cruel and unusual punishment. Goodwyn also brings state-law assault and battery

claims against Messer, Adams, Roberts, and Statzer; what he calls "assault by agent" claims

against Roop, Hayes, and Adams, based on their use of dogs (Roop, Hayes) or Oleoresin

Capsicum ("OC") spray[1] (Adams) against him; and state-law claims of willful and wanton

---

[1] OC spray is a chemical agent similar to what is commonly known as pepper spray or mace, and it can irritate a person's eyes, throat, and nose. *See, e.g.*, *Park v. Shiflett*, 250 F.3d 843, 849 (4th Cir. 2001).

negligence against Franklin, Fleming, Messer, and Dickenson.

As discussed in more detail in setting forth the factual background of Goodwyn's claims, all of his claims arose during the course of a single day. That day began with Goodwyn's involvement in an offender-on-offender assault in Red Onion's A-1 pod, at a time when the entire lower tier of the pod had been released from their cells for breakfast, and ended with his placement in a segregation cell in ambulatory restraints, where he was held for approximately twenty-four hours. All of the alleged uses of force occurred in the immediate aftermath of the fight, as officers sought to stop Goodwyn from fighting and gain control of him so he could be restrained, or during the course of Goodwyn's subsequent escort to the segregation cell.

## I. LEGAL FRAMEWORK

Section 1983 provides a cause of action for "impos[ing] civil liability on any person who, under color of law, deprives another person of federal constitutional or statutory rights . . . elsewhere conferred." *Daniczek v. Spencer*, 156 F. Supp. 3d 739, 747 (E.D. Va. 2016). To prevail under § 1983, a plaintiff must show both that he suffered "the violation of a right secured by the Constitution and laws of the United States" and that the "deprivation was committed by a person acting under color of state law," *West v. Atkins*, 487 U.S. 42, 48 (1988). *See Daniczek*, 156 F. Supp. 3d at 747.

Goodwyn's constitutional claims all allege violations of the Eighth Amendment, which "prohibits the infliction of 'cruel and unusual punishments.' In the prison context, it protects inmates from inhumane treatment and conditions while imprisoned." *Iko v. Shreve*, 535 F.3d 225, 238 (4th Cir. 2008) (quoting U.S. Const. amend. VIII) (other quotation marks omitted). An inmate's Eighth Amendment claim involves both an objective and a subjective component. *Id.* Specifically, the inmate must show that the "deprivation suffered [by] or injury inflicted on the

2

inmate was sufficiently serious (objective component)" to warrant constitutional protection and that the "prison official acted with a sufficiently culpable state of mind (subjective component)." *Id.*

To succeed on his excessive force claim against any defendant, Goodwyn must prove not only that "nontrivial" force was applied, but also that the defendant alleged to have used excessive force against him did so "'maliciously and sadistically' rather than as part of 'a good-faith effort to maintain or restore discipline.'" *Wilkins v. Gaddy*, 559 U.S. 34, 39–40 (2010) (quoting *Hudson v. McMillian*, 503 U.S. 1, 6–7 (1992)).

As to Goodwyn's bystander liability claims against the defendants, an officer may be liable as a bystander if he: "(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *Randall v. Prince George's Cty.*, 302 F.3d 188, 204 (4th Cir. 2002). If, however, the officers who used force on Goodwyn did so without violating his constitutional rights, then there can be no bystander liability. *Thomas v. Holley*, 533 F. App'x 208, 221 (4th Cir. 2013) ("[A]ny bystander liability . . . must be based upon being a bystander to the unconstitutional conduct of [the offending officers].") Put differently, bystander liability will lie only where, at a minimum, there is an underlying constitutional violation by another officer. *See id.*

Goodwyn's state-law intentional tort and gross negligence claims fail if his excessive force claims fail. *See Johnson v. Dep't of Alcoholic Beverage Control*, No. 3:15-CV-00055, 2016 WL 7235836, at *8 (W.D. Va. Dec. 13, 2016) (collecting authority and summarizing that "[t]he court finds ample authority indicating that plaintiff's claims of gross negligence, battery, and assault 'rise or fall' with his excessive force claim"); *see also Calloway v. Lokey*, 948 F.3d 194, 205 (4th Cir. 2020) (affirming district court's dismissal of state-law torts including claims

for assault where district court had correctly dismissed the plaintiff's Fourth Amendment claim based on the same events).

The claims against Kiser and Franklin are based on Goodwyn's placement (and retention) in ambulatory restraints without allowing him to shower to eliminate the effects of the OC spray, as well as his allegation that the restraints were applied improperly and were too tight. These claims are also governed by the Eighth Amendment, and courts have analyzed such claims both as excessive force claims and as unconstitutional conditions-of-confinement claims. *E.g.*, *James v. Bailey*, No. 3:15CV519, 2017 WL 193494 (E.D. Va. Jan. 17, 2017) (noting that it is "not entirely clear" which type of analysis is applicable to claims involving the use of ambulatory restraints, but analyzing it under both and dismissing claim); *Holley v. Johnson*, No. 7:08CV00629, 2010 WL 2640328, at *12–15 (W.D. Va. June 30, 2010) (evaluating claim under both). This Report likewise analyzes his allegations under both types of claims.

To the extent Goodwyn's claims are conditions claims, they also include both an objective and subjective component. To succeed, Goodwyn must "first show that he was incarcerated under conditions posing a substantial risk of serious harm." *Makdessi v. Fields*, 789 F.3d 126, 132 (4th Cir. 2015). This requires a showing of "significant physical or emotional harm, or a grave risk of such harm." *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995). Next, he must establish that the prison official had "a sufficiently culpable state of mind," that is, "deliberate indifference to [the] inmate['s] health or safety." *Id.* To establish deliberate indifference, Goodwyn must show that the defendant was personally aware of facts indicating a substantial risk of serious harm, and that the defendant must have actually recognized the existence of such a risk. *See Farmer v. Brennan*, 511 U.S. 825, 838–40 (1994); *Conner v.*

4

*Donnelly*, 42 F.3d 220, 222 (4th Cir. 1994).  The defendant then must have failed to take

"reasonable measures" to alleviate the danger.  *Farmer*, 511 U.S. at 832.

As to all of his claims, Goodwyn bears the burden of establishing the elements of each by

a preponderance of the evidence.  "As the Supreme Court has explained, 'the burden of showing

something by a preponderance of the evidence simply requires the trier of fact to believe that the

existence of a fact is more probable that its nonexistence.'"  *United States v. Manigan*, 592 F.3d

621, 631 (4th Cir. 2010) (quoting *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers

Pension Tr. for S. Cal.*, 508 U.S. 602, 622 (1993)) (alterations omitted)).

## II.  FACTUAL BACKGROUND

Goodwyn filed his amended complaint in September 2018.  In August 2019, the

presiding district judge denied defendants' motion for summary judgment, with the exception of

granting it as to Goodwyn's official-capacity claims for money damages.  (Dkt. Nos. 84, 85.)  He

then referred the case to me for a bench trial and written report setting forth appropriate findings

of fact, conclusions of law, and a recommended disposition of the remaining claims.  (Dkt. No.

88.)  The relevant evidence in the record is summarized below.

## A.     Factual Overview of Goodwyn's Claims

Goodwyn admitted at trial that he had a weapon (soap in a sock) and that he was fighting

with other offenders in the A-1 pod.  He also admitted that he did not immediately comply with

orders to drop his weapon and lay motionless on the ground.  He claimed that, despite his general

compliance with orders thereafter, Adams sprayed him with OC spray and Roop engaged his

dog, resulting in the dog biting Goodwyn's leg or legs.[2]  He also claims that, thereafter, Messer

used excessive force in trying to place him in handcuffs and leg restraints by standing on his

---

[2]  The medical records reflect that Goodwyn, at least later in the day, had dog bites on both legs.  Roop
testified, though, that his dog only bit Goodwyn on the left leg.  This issue is discussed in more detail herein.

back.  Then, after he was in restraints and stood up, he alleges that Adams purposefully kicked his foot, causing lasting injuries to his ankle.[3]

Upon leaving the A-1 pod, Goodwyn was given medical attention for the dog bite to his left leg, and he was interviewed by intelligence officer Reba Sue Murphy.  According to many of defendants' witnesses, Goodwyn continued to be belligerent and non-compliant as he was being escorted, although Goodwyn denied this at trial.

Based on reports to Steven Franklin that Goodwyn had been assaultive with staff in the A-1 pod and that he continued to be non-compliant, Franklin ordered that Goodwyn be placed in ambulatory restraints and placed in a segregation cell.  According to Goodwyn, as he was transported to the segregation cell to be placed in those restraints, Roberts slammed his head and face into a door frame and Statzer painfully bent his left wrist back.  Goodwyn also alleged that while his face was up against the door frame in the A-123 vestibule, he was bit by another dog on his right leg, which he believes was being controlled by Hayes, a second K-9 officer.  He alleges that Fleming, Dickenson, Roberts, and Statzer should be held liable because each of them was present, but failed to stop the excessive uses of force by Roberts, Statzer, and Hayes.

From the time Goodwyn left the A-1 pod and at least until he was placed in the segregation cell, Goodwyn testified that he was experiencing difficulty breathing as a result of the OC spray.  He testified that he repeatedly asked to shower in order to fully decontaminate from the effects of the OC spray, but none of the defendants permitted him to shower.  This includes a request to Kiser after Goodwyn was in his segregation cell.  At trial, he also asserted

---

[3]  The morning that he was released from the ambulatory restraints, on December 18, 2020, Goodwyn complained of pain in one of his wrists and one of his ankles, and there are references in his medical records to swelling on that date.  (Pl.'s Ex. 7 at 3.)  X-rays were ordered of his right ankle and his left wrist.  The interpreting doctor listed his impression as "diffuse soft tissue swelling without acute fracture or dislocation in right ankle."  As to Goodwyn's wrist, the doctor noted "no acute fracture or dislocation in left wrist" and did not note any swelling. (*Id.* at 6, 7.)

that he was unable to wash off while in the segregation cell.  Goodwyn challenged Franklin's decision to place him in ambulatory restraints as unconstitutional, and asserted that the restraints were secured too tightly, causing him pain.  He was released from the restraints the following morning, approximately twenty-four hours later.

In general terms, defendants denied that most of the force as alleged by Goodwyn occurred at all.  Adams admitted spraying Goodwyn with OC spray, and Roop admitted deploying his dog, Lojzo, to bite Goodwyn, but most of the remainder of the conduct was denied by the respective defendants.  Specifically, Messer denied standing on Goodwyn's back; Adams denied kicking Goodwyn while escorting him from the A-1 pod; Roberts and Statzer denied slamming Goodwyn into a door frame, although they admit that they "walked him up to the door" and held him there to keep him from spitting at or biting anyone; and Roberts and Statzer also denied bending Goodwyn's wrist back to cause pain.  Hayes also denied engaging his dog at any time on Goodwyn.

Moreover, when asked, the other defendants testified that they did not witness any excessive use of force against Goodwyn, including some of those described by Goodwyn, such as standing on his back, kicking him, slamming him into the wall, and bending back his wrists. Many of them also testified that, had they witnessed such conduct, they would have reported it. Several further testified that if they did not report such conduct and it was later found to have occurred, they could have lost their jobs.

**B.    Trial Testimony & Documentary Evidence**

All ten defendants testified at trial, as did Goodwyn.  Goodwyn additionally called two inmate witnesses—Roscoe and Hickman—and defendants called four additional witnesses— intelligence officer Murphy, Nurse Deel, correctional officer Clevinger, and institutional

investigator Christopher Gilbert.  Rather than summarize each individual's testimony separately,

I will discuss the testimony and other evidence as it relates to each separate allegation of

excessive force.  Before doing so, however, I discuss Goodwyn's assertions that defendants (or

someone) edited certain videos to omit instances of excessive force.

### 1.  Allegations of tampering with video evidence

In addition to the documentary evidence, videos of some of the events were introduced

into evidence at trial, which were viewed multiple times as a number of witnesses were

questioned about portions of one or more of those videos.  Goodwyn highlighted two videos as

allegedly showing some of the uses of excessive force against him.  The first was the RapidEye

Video (Defs.' Ex. 4), which showed A-1 pod before, during and after the altercation on

December 17, 2015.  Specifically, the RapidEye Video showed the altercation in the pod, some

portion of the uses of force by Adams and Roop, and Goodwyn being escorted out of the pod.  It

contains three different views, only two of which captured images of Goodwyn: "Pod Left" and

the "PTZ View."[4]  Significantly, the RapidEye Video (Defs.' Ex. 4) largely supports defendants'

version of events.[5]  I will provide additional details from the RapidEye Video in discussing each

alleged use of force.  Notably, though, the time-stamps show that from the time of the fight until

---

[4] As described by the presiding judge in his memorandum opinion on summary judgment, the RapidEye
Video "is not a continuous recording of events; instead, by its very nature, it contains gaps. . . . The 'PTZ' view does
not show Goodwyn at all times because it was being manually controlled for much of the relevant time period."
(Mem. Op. 7, Dkt. No. 84.)  But it does contain some of the relevant events, with a full view of Goodwyn, and
others where his feet are clearly visible.  (*Id.*)  The Pod Left view is much wider, so Goodwyn is in view, but only
"from a distance" and "[z]ooming in to see events sacrifices clarity."  (*Id.*)

[5] In ruling on defendants' summary judgment motion, the presiding judge noted that a number of facts
were unclear from the RapidEye Video.  For example, the court noted that it could not tell for certain if Goodwyn
was moving or kicking at Vanover.  (Mem. Op. 7, Dkt. No. 84.)  At that time, however, the court did not have the
benefit of any explanation by any defendant as to what he believed the video showed or at what points.  With several
of the defendants pointing out specific portions of the video with more particularity, and with Goodwyn's additional
testimony, the events depicted are more understandable.

the time Goodwyn exited the pod, only slightly over two minutes passed.  Thus, the events all

unfolded quickly.

The second, a Handheld Video (Defs.' Ex. 5) began with Goodwyn flanked by officers

with his face against a door frame in the A-123 vestibule and then showed him being escorted to

his B-3 segregation cell, being placed in ambulatory restraints, and being placed in the cell.

Goodwyn argued at different points during the trial and stated during his own testimony

that there was missing footage from the RapidEye Video and the Handheld Video.  As to the

RapidEye Video, he alleged that additional footage existed that had been edited out of the video.

He claimed that he saw additional footage in the video when he was shown it earlier in the case,

before summary judgment.  In particular, he claimed that Adams kicking him was visible on the

video he watched, but did not appear on the RapidEye Video introduced at trial.  At one point in

his testimony, he seemed to be saying the same was true as to Messer standing on his back,

although he later clarified that he never saw that on the video, but he believed the video must

have depicted it because he knew it happened.

As to the Handheld Video, Goodwyn appears to assert that the footage should have begun

earlier, basing this assertion on the report of correctional officer Clevinger, the camera operator,

which stated that recording began in the A-456 vestibule.  Goodwyn also alleges that there

should have been two other videos that he believes existed at some point, but were never

produced.  I address each of these allegations briefly.

First of all, as to any alleged tampering with the videos that were introduced as exhibits,

defendants introduced the testimony of Christopher Gilbert.  Gilbert was a corrections lieutenant

on December 17, 2015, and is currently an institutional investigator.[6]  He testified that he is not

---

[6] Gilbert has no recollection of the incident and does not believe he interacted with Goodwyn at all during that day.

aware of any software at Red Onion, within the Virginia Department of Corrections ("VDOC"), or within the intel office that would allow editing, redacting, or deleting portions of video within a longer segment. Video is copied and saved to an external hard drive once the intel office learns of an incident at a particular time and place. Red Onion does not have the capability to thereafter delete portions of it and splice the remaining portions together. Moreover, as Gilbert noted and I observed while watching the videos, the time-stamps or counters are not disrupted in any way during the videos, and no time segments were missing. Likewise, the videos do not otherwise show any indication of being altered. In short, I find Goodwyn's allegations of tampering with both the RapidEye and Handheld Videos to be unsupported.

As to the Handheld Video, though, I note that Goodwyn's confusion is understandable. At trial, officer Clevinger testified that he was operating the camera, he captured the entirety of the events shown without stopping, and no footage was missing. But Clevinger said in his incident report that he began filming in the A-456 vestibule and continued through Goodwyn's placement in ambulatory restraints in B-304. Goodwyn testified, however, that the Handheld Video begins in the A-123 vestibule. After Goodwyn questioned Clevinger about it and Clevinger reviewed the video, Clevinger agreed that the filming began in the A-123 vestibule and his report was incorrect. Goodwyn seized upon this error in Clevinger's report to suggest that additional video footage existed that was edited or omitted (from Goodwyn's transport from the A-456 vestibule to the A-123 vestibule). But I find credible Clevinger's explanation for this mistake: he was a relatively new officer, this may have been the first incident report he wrote, and he mistakenly put down the incorrect vestibule. He flatly denied that earlier footage that was not included in the Handheld Video existed, and I find that denial credible.

As to the two "missing" videos, Goodwyn has not proved that either ever existed.  First, Goodwyn alleges that a stationary camera in the A-123 vestibule should have recorded video footage showing Hayes engaging his dog on Goodwyn's right calf and presumably Goodwyn being "slammed" into the doorframe.  He presented no testimony from anyone, based on personal knowledge, that a camera was recording events in that vestibule on the date in question or that it would have shown the events he described.  Nor did he present evidence that he had requested retention of any such video or notified defendants of the possible materiality of that area and time-frame before such footage likely would have been automatically overwritten, per VDOC policy.  Thus, even if such video existed at some point, the record is not sufficient to show that defendants reasonably should have anticipated litigation and reasonably should have known that it might be relevant.  *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 327 F.R.D. 96, 103 (E.D. Va. 2018) (discussing spoliation sanctions permitted by Federal Rule of Civil Procedure 37(e) and noting that a duty to preserve electronically stored evidence is triggered where a party reasonably should have anticipated litigation and should have known that the evidence might be relevant).

Goodwyn's allegations about a second "missing" video relate to some of the still photographs that were introduced into evidence as Plaintiff's Exhibit 8.  Specifically, Goodwyn argued at trial that the photographs taken of him, which were introduced into evidence, came from a video, but that video was never produced.  No testimony, however, established who took the photographs or when.  Clearly, at least some of them were taken while Goodwyn was in ambulatory restraints and from the front of his body, and Goodwyn testified that they were taken at the time he was placed into restraints.  From this, he contends that additional video footage existed that should have been on the primary Handheld Video because that video never moves to

11

the front of Goodwyn's body. But no evidence shows that the still pictures came from a video at all. Indeed, defendants offered the testimony of Gilbert on this point, too. Gilbert testified that typically, a handheld video camera is used to take still photos and that some of the cameras can take video and still photos. The likeliest conclusion is that a video camera was used, but only still photos were taken. In any event, Goodwyn did not establish that the photos came from an actual video or longer recording.[7] He has failed to establish that any video is missing.

### 2. The fight in A-1 pod

All parties agree that, on the morning of December 17, 2015, an offender-on-offender altercation began in the lower tier of A-1 pod after those inmates were released from their cells for breakfast. Goodwyn admits that he attacked another offender with his weapon (soap in a sock) and that two other offenders became involved in the fight. Officer Clevinger, who was stationed in the control booth, noticed the altercation and gave an audible order to all offenders to stop fighting and get on the ground. He then shot an OC round shortly followed by four "impact rounds" toward the fighting offenders. Neither the OC nor the additional rounds stopped the fighting.

A number of officers were directed to report to the A-1 pod, including two K-9 officers, Roop and Hayes, both of whom brought their dogs with them. Several of the witnesses who reported (including Roop, Fleming, and Dickenson) described a very "chaotic" scene upon their arrival. Clevinger stopped shooting rounds after staff, supervisors, and K-9 staff responded, so as to avoid accidentally injuring any staff. (Trial Tr. 294–95; Defs.' Ex. 10.)

---

[7] Goodwyn believed that some of the pictures (the picture of his face and his leg) came from Murphy, and said they were in her report. He recalled her using a video camera while interviewing him and thus believed there was video from that time-frame, too. He admitted that he could not tell whether she was taking video or simply still pictures, but he thought it was recording video because "the side [of the video camera] was open." In any event, Murphy testified that she did not take the photos. (Trial Tr. 172.)

Goodwyn admitted at trial that he did not obey orders of the control booth officer and kept fighting and that he ignored the rounds being shot from the control booth, even though one landed above his head.  He also acknowledged that Roop came in and told all offenders to stop fighting and lie down.  Goodwyn acknowledged that he did not lie down immediately as Roop ordered, but instead walked a few steps away from the area of the fight.  He claimed that he did so because he did not want to be assaulted while lying on the ground by the offenders with whom he had been fighting.  (Trial Tr. 228–29.)

The RapidEye Video, at approximately 7:16:03, shows that several inmates begin to fight.  Roop entered the pod view at 7:16:18, and when he entered, most of the offenders already were lying down, but Goodwyn and a few others in the back left corner of the pod (in front of Cells 108 and 109) continued to fight.  It appears that Roop's dog first engaged on another offender in that group, which is consistent with Roop's report.  While that was occurring, it appears that the other offenders who had been fighting, including Goodwyn, did not immediately stop fighting.  Although it is unclear from the RapidEye Video exactly who was moving during that time, it is clear that at least some of the other three offenders continued to move and were not all lying down.  Movement can be seen in that area.  Roop then turned to Goodwyn.

### 3. Adams's spraying Goodwyn with OC spray and Roop's use of dog to bite Goodwyn

The uses of force by Adams and Roop occurred very close in time, and so I discuss them together.  Most of the details about Adams's use of OC spray came from Goodwyn's testimony or from Adams's testimony, which was largely his recollection refreshed by what he wrote in his incident report (Pl.'s Ex. 3) and what he saw in the RapidEye Video.  Adams had very little independent recollection of the events of that day.

Adams, a Red Onion correctional officer on December 17, 2015, was in the A-3 pod when he was called to the A-1 pod for an offender fight. Adams said that he used a one-half second or one-second burst of OC spray on Goodwyn and that he would have used it when Goodwyn was kicking the other officers.

Goodwyn testified that he was sprayed with OC spray first, and them shortly afterward, Roop engaged his dog to bite him. Regardless of the order, Goodwyn admitted that he did not immediately lie down when told to by Roop. Instead, he testified that he first moved several feet away from the other offenders with whom he was fighting. Goodwyn testified that while he was lying on the floor, Adams came up to him, bent down and sprayed him with OC spray.[8] Once he was sprayed, Goodwyn cursed at Adams, saying, "What the 'F' you spray me for?" He says then that "everything . . . went crazy." (Trial Tr. 229.)

The RapidEye Video reflects that, by 7:16:44, Goodwyn was lying on the ground and it appears that Adams is approaching him with his arm outstretched in front of him, possibly holding a cannister of OC spray. It is not possible to see whether OC spray was used then or not. Roop and his dog are nearby, although it is not possible to see if the dog is biting Goodwyn or not. Adams then moves away and for several seconds only Roop and his dog are near Goodwyn. Two seconds after Adams had approached, at 7:16:46, Goodwyn appears to be pushing up from the floor. Then, by the next second, 7:16:47, the PTZ view shows Roop's dog on the right side of Goodwyn's torso. The dog then appears to be facing the other way, either going over Goodwyn toward Goodwyn's left side or engaging on Goodwyn's left calf. Roop testified that at 7:16:50, the PTZ view shows the dog engaged on Goodwyn's left calf.

---

[8] Goodwyn claimed that the original video showed him being sprayed, but was edited to omit it. (Trial Tr. 272.)

Goodwyn testified that after Adams sprayed him with OC spray and at a time when he was already lying down and, according to him, being compliant, Roop deployed his dog on him. Goodwyn admitted at trial that the RapidEye Video shows him kicking and that he was not lying motionless as directed to do, but he contends that neither the OC spray or the dog was necessary, because he was lying facedown and therefore being "compliant."

As Roop and other officers explained, though, Goodwyn and the other offenders were repeatedly told to lie facedown and motionless, with their arms out from their bodies, palms up, and their feet crossed. Goodwyn was lying facedown, but he did not place his arms out or cross his legs and was instead kicking and later cursing about Adams's use of OC spray.

Goodwyn was unsure of exactly what was happening, and he said he could not see because he had just been sprayed. He testified that he knew the dog sniffed at his face and the dog got on his back, but he believed the dog was put off by the smell of the spray and so did not bite his face. He testified that he did not even feel the dog bite him on his leg because his "adrenaline was pumping" as a result of the fight. (Trial Tr. 230.)

Roop testified consistently with his report, which he prepared on the same date. Roop is a former employee of VDOC and on December 17, 2015, he was employed as a K-9 officer at Red Onion. His dog's name was Lojzo. On that date, he received a report of an offender-on-offender fight in the A-1 pod, and he responded to that location. He described the scene as "chaotic." (Trial Tr. 20.)

When Roop entered the pod, he instructed all of the offenders to lay down on the ground as he was moving through the pod with Lojzo. Several offenders did not comply and continued to fight, and Roop first engaged Lojzo on offender Jones, who also had continued to fight. Roop explained that "engaging" means deploying his dog to bite someone. Lojzo bit Jones's left hand.

15

After Roop disengaged his dog from Jones, he saw Goodwyn moving and believed he was trying to assault another offender. As Roop next approached Goodwyn, he told Goodwyn several times to lay on the ground, arms out, feet crossed. Goodwyn had started to lie down, but he also was moving and appeared to be trying to get back up, a fact confirmed by the video. Because Goodwyn was not complying, Roop engaged Lojzo—on Goodwyn's left calf—for at most five seconds. Once Goodwyn was compliant, Roop ordered Lojzo to disengage and Lojzo promptly did so. (Defs.' Ex. 1.)

For a brief time after the dog disengaged, according to Roop, Goodwyn was compliant, and a number of other officers surrounded Goodwyn to attempt to place him in restraints. Shortly thereafter, though, Goodwyn became combative again, kicking and resisting staff from restraining him properly.[9]

### 4. Messer's standing on Goodwyn's back

The next use of excessive force alleged by Goodwyn is that Messer stood on his back. I conclude that this did not occur.

After Lojzo disengaged, other officers moved in to try and place Goodwyn in restraints. During this period, the RapidEye Video shows Goodwyn resisting, and Goodwyn admitted that the video showed his legs moving. Goodwyn's right leg is raised off of the floor and appears to be kicking at 7:17:15.933 in the PTZ view. His legs appear to be moving again at 7:17:26. Five seconds later, an officer is standing near Goodwyn's feet trying to restrain him, but at

---

[9] Goodwyn's continued failure to comply was not noted in Roop's contemporaneous reports (Defs.' Ex. 1–3). Instead, in his reports (all of which utilized nearly identical language), Roop stated that after he disengaged his dog from Goodwyn, "all offenders were complying with all orders and responding staff restrained the offenders involved in the fight, while I maintained security." (Defs.' Exs. 1–3.) At trial, Roop explained the discrepancy by stating that he might not have noticed Goodwyn's continued non-compliance at the time, but upon reviewing the video of the incident, Roop saw Goodwyn being non-compliant and combative again after the dog disengaged. Roop said at the time his attention was focused elsewhere, which is consistent with his report's statement that other staff were restraining offenders while he was "maintain[ing] security." (*Id.*)

7:17:31.766, and from 7:17:34.433 through 7:17:35.149, Goodwyn's left leg is off the ground and kicking. Again at 7:17:37.399, his feet are still moving. Thus, for a period of at least twenty-two seconds while officers are trying to restrain Goodwyn, the video shows him kicking and/or moving his legs.

Goodwyn testified that he could feel the person on the right side of his body standing on his back. He stated that while he was on the ground, he felt an officer's right foot at the small of his back and a left foot step on the right side of his head, although he could not be entirely sure that it was Messer.

For his part, Messer flatly denied standing on Goodwyn's back. Messer testified consistent with his report from the date. When he arrived at the A-1 pod, he observed officers Adams and Vanover attempting to restrain Goodwyn, who was being combative. He observed Goodwyn attempting to stand up and kicking at Officer Vanover. Messer assisted Officer Adams in trying to handcuff Goodwyn, but Goodwyn was flailing and kicking and kept trying to turn over. Messer testified that he told Goodwyn to stop resisting.

Messer stated that he briefly placed his knee on Goodwyn's shoulder and pressed down, which he testified was an approved use-of-force technique and necessary to control Goodwyn's hands so that they could get restraints on him. Based on the totality of the evidence, and paying particular attention to Goodwyn's movements in the video, I conclude that Goodwyn was, in fact, continuing to resist officers' commands and was not being compliant, even after Roop's dog disengaged.

Some of the other officers were also asked about this portion of the incident, and they testified that at no time did they see Messer standing on his back. Moreover, it certainly does not

appear in the video.  For all of these reasons, I conclude that Goodwyn has not proved that this use of force occurred.

### 5.  Adams's kicking Goodwyn as they left the pod

As with the incident involving Messer standing on his back, Goodwyn's allegation that Adams kicked him as they stood him up to leave the pod does not appear on the RapidEye Video.  Nonetheless, Goodwyn testified that Adams kicked him as soon as they got him off the floor and stood him up.  According to Goodwyn, Adams kicked him hard, causing injury to Goodwyn's ankle and foot, and he had "black scuff marks" all over his new tennis shoes afterward.  Adams denied kicking him or in any way abusing him.

The RapidEye Video shows that by about 7:18:10, the officers have been able to get Goodwyn on his feet and they begin walking him out of the pod.  Goodwyn is out of view by 7:18:25.  Goodwyn acknowledged that Adams kicking him is not visible on the version of the RapidEye Video submitted at trial, but he claims that it was on the RapidEye Video when he was first shown it, prior to summary judgment.  Again, the only "evidence" Goodwyn points to in an attempt to counter the video is his bald assertion that the kick must have been edited out of the video.  As already noted, I find this assertion to be unsupported and unbelievable.

Goodwyn also offered testimony from a fellow offender on this point, but that offender's testimony was inconsistent with Goodwyn's, and I do not find it credible.  Specifically, Emmitt George Roscoe, Jr., who was confined in his second tier A-1 cell during the events at issue, testified that he saw Goodwyn being escorted out of the pod and saw an officer kick Goodwyn in the leg.  He believed it was Goodwyn's left leg, around his calf muscle.  He said that Goodwyn was in handcuffs and shackles and was being compliant.  Goodwyn did not fall, but he briefly "hesitated" when kicked as if he was in pain.  (Trial Tr. 120.)  The officers continued to

"forcefully escort him out of the pod." (*Id.*)  In addition to identifying the wrong leg on which

Goodwyn was allegedly kicked, Roscoe also described the kick as occurring while Goodwyn

was being escorted out of the pod.  Goodwyn, by contrast, testified that he was kicked

immediately as the officers got him up from the floor and while he was surrounded by officers,

not as he was walking out of the pod.

In short, given the inconsistent testimony offered by Goodwyn and Roscoe and Adams's

credible denial of having kicked Goodwyn, which is supported by the RapidEye Video, I

conclude that this use of force did not occur.

### 6.  Goodwyn's conduct while being transported

Messer's report indicates that he and Officer Adams escorted Goodwyn from the pod to

A-3 and that Goodwyn "became combative once again," such that he and Adams had to place

Goodwyn on the ground outside of Cell A-303.  Once they regained control of him, they escorted

him to the A-456 vestibule, where he was assessed by medical staff.  (Pl.'s Ex. 1; *see also* Pl.'s

Ex. 3 (Adams's Incident Report).)

Goodwyn testified that, after leaving the A-1 pod, he was taken to the A-456 vestibule,

where Nurse Woods assessed him.[10]  She cleaned his face with gauze and water, and she cleaned

the dog bite on his left leg.  He testified that he was then interviewed by Murphy.  According to

Goodwyn, when he complained about being unable to breathe, Murphy asked the escorting

officers to take Goodwyn outside to get air.  She began the interview just outside the A-456

vestibule, and then they took him back inside that vestibule.  Murphy testified, however, that she

did not see any signs that he had been sprayed with OC spray, Goodwyn did not say he had, and

---

[10]  Goodwyn had wanted the nurse who treated him, Nurse Woods, to testify at trial, but she was no longer
a VDOC employee at the time of trial and Goodwyn did not tender fees for her attendance or mileage or otherwise
serve her in order to require her attendance.  Notably, though, he was able to introduce all of Nurse Woods's notes
and medical records through Nurse Deel.

she did not instruct that he be taken outside. She noted, though, that the officers had the door open to the outside of the building.

Goodwyn claimed that, throughout his transport, he was not being irate or "bucking," and, as proof, he emphasized that he had never before received a charge for doing anything to a correctional officer. He testified that he does not have issues with officers, does not argue with them, and does not "catch stupid charges." He admitted, though, that he was upset about having been sprayed and bitten by the dog even though he was lying down and his "adrenaline was pumping" until he was placed in the segregation cell. He also said it was a "very adrenaline-filled" morning and that he was "charged up." His own description of his state of mind suggests that he could have been acting differently than normal.

I also find it significant that Murphy, an intelligence officer at the time who is not a defendant, testified consistently with other officers regarding Goodwyn's non-compliant behavior. Specifically, she emphasized that while she was interviewing him (which was after he had been assessed by medical and bandaged), he was acting "erratical[ly]." She described him as jerking around, tucking his head, and moving his head around and other parts of his body, when he was "supposed to be still." (Trial Tr. 166–67.)

### 7. Roberts's slamming Goodwyn into the door frame[11]

Goodwyn states that he subsequently was taken from the A-456 vestibule to the A-123 vestibule. As they reached that vestibule, he felt the "momentum picking up." (Trial Tr. 236.) He said that when he saw officers were moving him toward the wall, he tipped his head so that

---

[11] Goodwyn may have confused Statzer and Roberts and their respective position during his transport. (Trial Tr. 57–58.) As noted herein, Statzer was the person who was on Goodwyn's left throughout the Handheld Video. Roberts was on his right. Regardless, I do not find that either of these defendants used excessive force or engaged in the conduct of which Goodwyn accuses them (slamming his head or face into the door or improperly bending his wrists back in a painful fashion).

the wall would catch his forehead and not his face.  He testified that they then "rammed [his]

head into the wall."  (*Id.*)

Roberts testified that he began assisting in restraining Goodwyn so that Goodwyn could

be assessed by medical.  He states that he then assisted correctional officer Statzer, Sgt.

Dickenson, Sgt. Fleming, and Sgt. Messer in transporting Goodwyn to B3, where he was placed

in ambulatory restraints.  (Pl.'s Ex. 2.)

As noted, several of the officers (Roberts, Statzer, and Fleming) credibly testified that

Goodwyn was being disruptive and uncooperative and trying to be uncontrollable while he was

being transported, moving his head around and refusing to obey their orders to keep his head

facing forward.[12]  The officers said that he was placed at the door in the A-123 vestibule to

maintain control.  All of the officers present denied that he was slammed, rammed, or placed

forcefully against a wall or door.  They said it was not a rapid movement, but that just enough

pressure to move him and hold him up against the wall was used.

Roberts, for example, described that the officers "walked him up against the wall,"

because Goodwyn was trying to pull away and was moving his arms and head.  (Trial Tr. 61–

62.)  Roberts explained that Goodwyn was told multiple times to keep his head straight and

facing forward and that he continued moving his head after those warnings.  As Roberts

explained it, that type of movement is problematic, because the inmate could spit on an officer,

attempt to bite an officer, or "any multitude of things."  (Trial Tr. 72.)  Fleming, too, said that

Goodwyn was being combative and uncooperative and that he was therefore "placed on the door

to maintain control."  (Trial Tr. 89.)  Statzer similarly testified that he placed his right hand

---

[12]  Dickenson testified that he had no independent recollection of the incident or the events of that day.
Instead, his testimony would be based on his review of the video and the incident report he wrote on that day (Pl.'s
Ex. 4.).  But Dickenson denied having witnessed any use of excessive force against Goodwyn because had he
observed such a use, he would have reported it.

against Goodwyn's left cheek and that he only pressed him against the wall hard enough to hold

him against it and maintain control. (Trial Tr. 103–05.)

The Handheld Video begins in the A-123 vestibule with Goodwyn restrained and being

held with his face against a door jam. (Defs.' Ex. 5.) Although the start of the video is not

inconsistent with Goodwyn's assertion that he was "slammed" into the door, the video also does

not show that occurring. Given the other incidents that Goodwyn was certain had occurred—

some of which were flatly contradicted by other video—and the credible denials of the officers

present, I cannot find that Goodwyn has met his burden of proof to show that this use of force

occurred.

### 8. Hayes's engaging his dog on Goodwyn while in the A-123 vestibule

The next alleged use of force is that K-9 Officer Hayes allegedly engaged his dog on

Goodwyn while Goodwyn was in the vestibule surrounded by officers. Again, based on the

totality of the evidence, I find that this did not occur.

The testimony of the officers and Hayes on this point was credible. Not only did they

deny the use of force, but one common theme throughout the trial, echoed by various witnesses,

is that the two dogs being handled by Roop and Hayes were dangerous, responded to movement,

and did not distinguish between offenders and staff in biting individuals. Several of the officers

testified that if one of the dogs had been in either the vestibule with them, or in a hallway or

walkway as they escorted Goodwyn, the officers would have remembered, because that would

have caused them to try to get away from the dog. Statzer, for example, said that if a dog had

been in the vestibule with them, he "wouldn't be standing there." (Trial Tr. 111). Dickenson,

likewise, said that if a dog had come up and tried to bite Goodwyn while he was surrounded by

officers, "[e]very one of the staff members probably would have climbed a fence to try to get

away from it.  So yes, we definitely would have realized it if there had been a dog present."

(Trial Tr. 159.)  Similarly, Fleming testified that it would be "very unusual" to have a dog

engage with correctional officers around and that he would have noticed if a dog had engaged

Goodwyn while he was present because he doesn't "like to be around the dogs."  (Trial Tr. 93.)

Hayes himself said he would not have brought his dog into a vestibule with so many

officers present because there was just too great a risk that the dog would react to the movement

of one of the officers and bite an officer.[13]  Moreover, Hayes denied engaging his dog on

Goodwyn at any point that day.  (Trial Tr. 290–93, Dkt. No. 130; *see also* Defs.' Ex. 9 (incident

report by Hayes noting that there was no use of force by him or his assigned dog in A-1 pod).)

Critically, Goodwyn candidly admitted that he could not be sure that Hayes was the one

whose dog gave the second bite or that it occurred in the vestibule.  He infers that it occurred

based on the following: (1) he must have been bit at some point between seeing the nurse and

arriving in his segregation cell because the nurse did not see that wound and he did not notice

blood on his right leg until he got in the segregation cell; (2) the only time when he could not see

his legs (or that is not on video) is when he was up against the door frame, and so it must have

happened then; and (3) Roop allegedly said later, when observing the second bite, "I don't have a

dog in this fight," which Goodwyn took to mean that Roop's dog did not cause the second bite.

He admitted that he does not have any recollection of a dog actually biting his right leg then, or

at any other time.

Given Goodwyn's own uncertainty, and the testimony of Hayes and the officers, which I

find credible, I conclude that Goodwyn has not shown by a preponderance of the evidence that

---

[13]  Several of the officers also noted that you can see either the K-9 officers or the dogs themselves during the time that Goodwyn is being walked outside to the B-3 pod, and they are not near Goodwyn or the officers transporting him.  (*See, e.g.*, Trial Tr. 90–92 (Fleming testimony).)

Hayes engaged his dog on Goodwyn. Thus, the claims based on this use of force fail.

That leaves the question of when Goodwyn received the puncture wounds on his right calf. The wound was discovered by a nurse and documented the afternoon of the incident.[14] Specifically, Murphy testified that, at some point while Goodwyn was in ambulatory restraints, she was made aware that he was bleeding through his bandage, and she called medical. When Nurse Woods came to examine him, she noted three additional puncture wounds on his right calf, which she described as a "dog bite." (Pl.'s Ex. 6 at 1.) I believe that the most likely explanation for the second bite, given all of the evidence and the video, in particular, is that Roop's dog actually bit Goodwyn twice (perhaps less forcefully on the right leg) while Goodwyn was still in the pod, and that neither Roop nor Goodwyn noticed it at the time. No competent evidence exists that Goodwyn had any other interaction with a dog on that day, nor has Goodwyn identified any other injury he sustained that resulted in puncture wounds to his right calf.

Moreover, the RapidEye Video shows Roop's dog on both sides of Goodwyn's body at different times. Given the clarity of the video, it is not possible to see an actual bite, and I recognize that Roop stated he was certain his dog only engaged once.[15] But this explanation nonetheless seems the most logical, especially given Goodwyn's own lack of knowledge about when the second bite actually occurred, and the consistent and credible testimony from several defendants that no dog was in the vestibule with them or nearby while they were escorting

_____

[14] Goodwyn points out places in the Handheld Video where he believed the video showed blood on his right leg and possibly Nurse Deel looking at his right calf, both of which occurred before he was placed into his segregation cell. Even if the blood was there at that point, no competent evidence showed that anyone, including Goodwyn, noticed it at the time. He testified that he did not become aware of the blood or the bite on his right leg until after he was in the cell.

[15] Goodwyn stated, in comments at trial, that defense counsel was making the preposterous suggestion that Goodwyn purposefully injured himself while in the segregation cell. Counsel never made that argument.

Goodwyn.  Indeed, Goodwyn's testimony itself does not rule out that he was bitten twice while

lying on the ground in the pod.  Goodwyn stated that he felt the dog on his back and near his

face, but that he did not actually feel the dog bite him at any point.  He only knew he had been

bitten after his "adrenaline" stopped pumping and the nurse treated him for his wounds.

Regardless of when the second bite occurred, though, I find that Hayes did not engage his

dog on Goodwyn while in the vestibule or at any other time.

### 9.  Statzer's bending Goodwyn's wrist back to cause pain

Goodwyn next claims that Statzer (and/or Roberts) painfully bent his wrists back for no

reason.  The officers denied this, but noted that they had their hands on Goodwyn's hands to

maintain control.  I find their testimony more credible than Goodwyn's on this point.  In

particular, I find credible Statzer's assertion that he was using an approved wrist restraint to

maintain control of Goodwyn's hands in anticipation of them being moved to the front of his

body to be placed in the ambulatory restraints.  Goodwyn questioned witnesses about specific

points in the Handheld Video as showing the improper bending back of wrist.  Having reviewed

those points, it is true that his hands are being held and bent, but it does not appear that they are

being held with more force than is necessary to control him.  (*See, e.g.*, Handheld Video at 6:19.)

Moreover, although the position of his hands was likely uncomfortable, it does not appear that it

would cause pain, significant or otherwise.

### 10.  Defendants' refusal to allow Goodwyn to shower after being exposed to the OC spray

Goodwyn also challenges the fact that he was not permitted to shower before being

placed in the ambulatory restraints and the segregation cell.  His medical records reflect that he

complained about breathing problems to Nurse Woods initially, but her objective evaluation

reflected that he was not in any distress, he was not having any difficulty speaking, and his

oxygen levels were at 96%, which Nurse Deel testified meant he was breathing fine.  (Pl.'s Ex. 7 at 4.)

Goodwyn testified, though, that he twice specifically asked for a shower to decontaminate, and that he was denied the shower.  The first time was when officers had put him on the floor at some point during his transport to the A-123 vestibule.  He testified that he asked Messer for a shower, but that Messer just told him, "That was good."  He testified that he asked again for the shower in front of the B-3 segregation cell, requesting it from Fleming.  In response, Fleming said, "It don't matter," or something to that effect.  Goodwyn's version of events was echoed by one of his inmate witnesses, Donnell Hickman, who was in the cell above Goodwyn's.  Hickman testified that he heard Goodwyn request a shower.  He also testified that he heard Goodwyn say that the pepper spray was burning his eyes, but the officers denied him a shower.  According to Hickman, Goodwyn also complained that his shackles were too tight.  It is undisputed that Goodwyn never received a shower.

Despite Hickman's corroborating testimony, I do not believe Goodwyn has shown that he asked to shower.  None of the reports mention such a request, all of the defendants who were asked denied that he had asked for a shower or denied recalling any such request, and no request for a shower can be heard on the Handheld Video, contrary to Goodwyn's assertion.[16]

---

[16] Goodwyn argued at trial that the conversation could be heard on the Handheld Video.  Fleming provided a different description of what was said, and the Handheld Video largely confirms Fleming's version.  Specifically, Fleming asked Goodwyn questions about whether he had a weapon, what it was, and whether he used it.  He also asked Goodwyn why, when staff responded, Goodwyn would "turn over."  Goodwyn's responses are not audible. (Handheld Video at 12:40–13:21.)  At the end, Fleming says in response to something Goodwyn said, "It don't matter."  I have been unable to hear Goodwyn requesting a shower at any point in the video and given the context of what can be heard, I find it unlikely that he did so at this point.  Goodwyn also believed that the video confirmed his telling Nurse Deel that he could not breathe.  I was unable to  hear that statement, and Nurse Deel states to the camera that Goodwyn did not voice any complaints to her, but she noted that he had already been bandaged by a nurse, and she did not know what the nurse had "said to the camera."  (*Id.* at 13:20–14:20.)

But even if he had asked to shower, several of the officers testified (including Franklin) that the first steps of the decontamination process had occurred. Specifically, the first step is removing the offender from the area where the spray was applied. Fresh air can also reduce the effects of OC spray. Furthermore, Goodwyn himself testified that his face had been wiped down with gauze and water by the nurse before he was transported to his segregation cell.

Franklin testified that normally an offender is placed in the shower if he asks to be decontaminated, but that showering is not required. Franklin further testified that he never would have approved a shower in this situation and ordered Goodwyn taken to the shower, because of Goodwyn's disruptive and uncooperative behavior. He explained, "I'm not going to put my staff in a three-foot shower with somebody that's disruptive," and described the dangers to staff from doing so. (Trial Tr. 218.)

Franklin (and others) also emphasized that Goodwyn had been out in the fresh air and that he was in a cell that had access to water. Goodwyn alleges that his B-3 cell did not have running water because the water to the cell had been cut. His testimony on this point, though, was inconsistent and not credible.[17] By contrast, Franklin credibly noted that he would have no reason to turn off the water to a cell that has access to water, unless there was a concern that the individual might hide something, but there were no such concerns in this case. Moreover, the testimony of others concerning his mobility in ambulatory restraints showed that Goodwyn could have turned on the sink and put water on his face had he tried to do so. In any event, Franklin

---

[17] Goodwyn's testimony on this point was confusing and not particularly credible. At one point during his testimony, he stated that he "pushed" the sink to see if it had water. At another point, he stated that he was not able to get water in his hands or put it on his face because he could not lift his hands up. In yet another version of events, he stated that he never tried to turn on the water to wash his face, but he nonetheless claimed that he knew the water to the cell was off because the following day, in the same cell, he had to ask that it be turned on. (Trial Tr. 243, 244, 266–68.)

also credibly testified that he had no knowledge or information that Goodwyn had requested a shower or that he was in discomfort or pain because of the effects of OC spray.

### 11. Placement in Ambulatory Restraints

Lastly, as to Franklin, his sole involvement was that he made the decision to place Goodwyn in ambulatory restraints based on the reports he received from other officers regarding Goodwyn kicking Officer Vanover and his continued failure to comply with officer directives while being transported. (*See* Defs.' Ex. 6 (form signed by Franklin authorizing Goodwyn's placement in ambulatory restraints).) Franklin testified that if Goodwyn's only actions on the day had been the fight with the other offender, he would have been taken to segregation but not placed in ambulatory restraints. But because of reports to Franklin that Goodwyn was assaulting staff, kicking at staff, and being disruptive while being escorted, Franklin determined that Goodwyn needed to be put in ambulatory restraints.

I also note that two trial exhibits support the justification for Goodwyn's continued placement in ambulatory restraints for twenty-four hours, and also bear on Goodwyn's credibility as to other issues. Specifically, the 15-minute watch sheets reflect entries as to Goodwyn's behavior over the course of the twenty-four hours or so he was in segregation, in approximately fifteen-minute intervals. (Defs.' Ex. 7.) There are numerous references to Goodwyn "cursing," "cursing staff," and "banging" his chains or restraints, and at least six different sets of initials appear next to those entries. (*Id.*) Additionally, the log sheets for the B-3 pod for those dates also contain several references to disruptive behavior and cursing by Goodwyn.

Goodwyn denied at trial that he engaged in any of that behavior at any time while he was in his segregation cell, and he alleged that those entries were fabricated by the officers only to

keep him in ambulatory restraints longer.  He claims that the officers were angry that he had assaulted an officer.

I find Goodwyn's explanation not credible.  Instead, the fact that so many different individuals reporting on Goodwyn's behavior noted that he was sometimes cursing, cursing staff, or banging his restraints, makes it very likely that he was, in fact, engaging in that behavior.  I simply find it unlikely that so many different officers would have lied on logs and reports just to keep an offender in restraints longer.

Thus, I find that Goodwyn's blanket denial of the behavior recorded in the watch sheets and log books calls into question his credibility generally.  Further, because I think the evidence supports that he was engaging in that behavior later, it also lends some support to the various officers' assertions that Goodwyn was being combative and was belligerent or angry during the incident in the pod and during transport, even though Goodwyn denied it.  Lastly, his continued combative behavior was the reason offered for keeping him in ambulatory restraints.

## III.  DISCUSSION

"In a non-jury case, the court must make specific findings of fact and separately state its conclusion of law."  *Select Auto Imps. Inc. v. Yates Select Auto Sales, LLC*, 195 F. Supp. 3d 818, 823 (E.D. Va. 2016) (citing Fed. R. Civ. P. 52(a)(1)).  "The trial judge has the function of finding the facts, weighing the evidence, and choosing from among conflicting inferences and conclusions those which he considers most reasonable."  *Id.*  This task typically involves evaluating witness credibility and, in doing so, the judge may "disregard testimony of any witness when satisfied that the witness is not telling the truth, or the testimony is inherently improbable due to inaccuracy, uncertainty, interest, or bias."  *Id.* (citing *Columbus-Am. Discovery Grp. v. Atl. Mut. Ins. Co.*, 56 F.3d 556, 567 (4th Cir. 1995); *Burgess v. Farrell Lines,*

*Inc.*, 335 F.2d 885, 889 (4th Cir. 1964)).  When articulating its findings of fact, "[a] trial court

must do more than announce statements of ultimate fact."  *United Am. Ins. Co. v. Fauber*, No.

5:16cv19, 2017 WL 3911019, at *3 (W.D. Va. Sept. 6, 2017) (citing *United States ex rel.*

*Belcon, Inc. v. Sherman Constr. Co.*, 800 F.2d 1321, 1324 (4th Cir. 1986)).  The court is not

required, however, "to make findings on all facts presented or to make detailed evidentiary

findings . . . . The ultimate test as to the adequacy of the findings will always be whether they are

sufficiently comprehensive and pertinent to the issues to provide a basis for decision and whether

they are supported by the evidence."  *Darter v. Greenville Cmty. Hotel Corp.*, 301 F.2d 70, 75

(4th Cir. 1962).

**A.    Factual Findings**

       The undersigned makes the following factual findings based on the evidence presented at

trial:

    1.     Plaintiff Goodwyn was incarcerated within the VDOC at Red Onion on December

        17, 2015.  He was housed on the first level of the A-1 pod, until after the fight that

        day.

    2.     Defendant R. Adams was employed by the VDOC as a correctional officer at Red

        Onion on December 17, 2015.  He was in the A-3 pod when he received a report

        of offenders fighting in A-1 pod, and he proceeded to that pod to assist in gaining

        control over the offenders and securing the pod.

    3.     Defendant Roop was employed by the VDOC as a K-9 officer at Red Onion on

        December 17, 2015.  Roop responded to the A-1 pod after a "1018" was issued

        for that pod, which code means offender on offender fighting.

    4.     Defendant John Messer was employed by the VDOC as a sergeant at Red Onion

on December 17, 2015.  Messer reported to the A-1 pod and assisted other officers, including Adams and Vanover, in placing Goodwyn in restraints.

5.    Defendant Jordan Fleming was employed by the VDOC as a Corrections Lieutenant at Red Onion on December 17, 2015.  On that date, he was the B building sergeant and he responded to A-1 pod for a report of offenders fighting. Fleming observed Goodwyn being uncooperative and acting in a "turbulent manner."  Fleming was with the group of officers who escorted Goodwyn from at least the A-123 vestibule to his B-3 cell and supervised Goodwyn's placement in ambulatory restraints.  Fleming also narrated the Handheld Video that reflects Goodwyn's transport and his placement in ambulatory restraints.

6.    Defendant J. Roberts was employed by the VDOC as a correctional officer at Red Onion on December 17, 2015.  Roberts assisted in escorting Goodwyn from at least the A-123 vestibule to B-3, the segregation pod where Goodwyn was placed.

7.    Defendant J. Statzer was employed by the VDOC as a corrections officer at Red Onion on December 17, 2015.  Statzer assisted in escorting Goodwyn from the A-456 vestibule to his segregation cell.

8.    Defendant J.W. Kiser was employed by the VDOC as a corrections lieutenant at Red Onion on December 17, 2015.  All that he remembers of the event is that he appears on the Handheld Video when Goodwyn was being placed in ambulatory restraints, but he had no personal recollection of the events.

9.    Defendant Hayes was employed by the VDOC as a K-9 officer at Red Onion on December 17, 2015.  Hayes reported to A-1 pod to assist in securing the pod after an offender-on-offender fight broke out.  He did not engage his dog in the A-1

pod on any offender, and he did not engage his dog on Goodwyn at any point during that day.

10.    Defendant S.B. Franklin was employed by the VDOC as a lieutenant at Red Onion on December 17, 2015. He made the decision that Goodwyn should be placed in ambulatory restraints because of Goodwyn's behavior toward staff during the fight and during his transport to his segregation cell.

11.    Defendant Jerel Dickenson was employed by the VDOC as a Sergeant at Red Onion on December 17, 2015. He was one of the supervising officers who was in charge of ensuring that Goodwyn was properly placed in ambulatory restraints on that date. He assisted momentarily in maintaining control of Goodwyn while he was resisting staff as he was being escorted to B-3 and assisted in placing him in ambulatory restraints. He had very little recollection of the events of the day, but he did not see any excessive force during that day and, if he had, he would have reported it.

12.    Non-party Emmitt George Roscoe, Jr. was an inmate housed at Red Onion in cell A-127, on December 17, 2015. Cell A-127 is on the top tier of the pod and, throughout the events in the A-1 pod the morning of December 17, 2015, Roscoe was locked in his cell. He could see out into a portion of the main pod area only through his cell window. Roscoe's testimony that Goodwyn was kicked while he was being escorted out of the pod was not credible, in light of its conflicts with Goodwyn's own account and the RapidEye Video.

13.    Non-party Murphy was an intelligence officer who interviewed Goodwyn after the fight. She also was made aware later in the day that Goodwyn was bleeding

through his bandage, and she notified medical.

14.   At approximately 7:15 a.m. on December 17, 2015, the lower tier of offenders in the A-1 pod were released from their cells, and an altercation between offenders began shortly thereafter.  All of the offenders were out of their cells and four were involved in the altercation.  At the beginning of the altercation, there was only a single officer present in A-1 pod, as well as officers in the control booth.

15.   Goodwyn assaulted another offender with a weapon, specifically a bar or bars of soap in a sock.  At or around the same time he assaulted that inmate, several other inmates became involved in the fight.  Goodwyn heard, but ignored, orders from the control booth to stop fighting and lie down.  He also did not stop fighting even after the control booth fired an OC round and three other impact rounds, which landed near his head.  Instead, Goodwyn kept fighting.

16.   Several officers, including K-9 officers, reported to A-1 pod, where the scene was chaotic.  Most of the offenders were lying face-down and motionless, as directed, but several of the offenders, including Goodwyn, continued to fight.

17.   Goodwyn heard, but did not immediately obey the orders of K-9 Officer Roop, who entered the pod with his dog and repeatedly directed the offenders to stop fighting and to lie facedown and motionless with their arms to their sides, palms up, and with their feet crossed.

18.   Roop first engaged his dog on another offender, Jones, who was continuing to fight.

19.   In response to Roop's orders, Goodwyn did not immediately lie down, but at or around the time Roop engaged his dog on the other offender, Goodwyn walked

several steps away from the offenders with whom he had been fighting and then started to lie facedown. He did not cross his legs, nor was he motionless. Instead, his legs were moving and he appeared to be attempting to get up. Both Adams and Roop reasonably believed that Goodwyn was not complying with orders.

20.    At or about the same time that Roop was engaging his dog on the other offender, Defendant Adams, in a good faith attempt to gain and restore control over the offenders, utilized a short, one-half second to one second burst of OC spray on Goodwyn.

21.    Goodwyn reacted by cursing at Adams and asking him "Why the 'F' he had sprayed him?" Goodwyn was angry because he believed he was being sufficiently compliant, in that he was lying down. He admitted at trial, though, that he had continued to move after Roop gave orders not to, and that, while lying on the ground, his legs were moving.

22.    Because Goodwyn was not fully complying, Roop engaged his dog on Goodwyn in a good faith effort to restore discipline. The dog bit Goodwyn's left calf. The dog also may have bitten Goodwyn's right calf.

23.    After Roop disengaged his dog, Goodwyn briefly complied with directions, but he then continued to resist the officers who were trying to place him in restraints. This included kicking at officer Vanover, who was at Goodwyn's feet.

24.    Messer did not stand on Goodwyn's back at any time. Messer used an approved VDOC technique of pressing his knee down on Goodwyn's shoulder, to assist in getting handcuffs on Goodwyn, who was not cooperating at the time.

25.    Eventually, Vanover, Adams, and Messer were able to secure Goodwyn's hands

and legs in restraints.

26.     Goodwyn was then stood up. Adams did not forcefully or purposefully kicked

Goodwyn as he was brought to his feet or as he was escorted out of the A-1 pod.

27.     Goodwyn was escorted from the A-1 pod by Adams and Messer.

28.     The entire incident (from the start of the fight until Goodwyn left the A-1 pod)

lasted approximately two minutes.

29.     After leaving the A-1 pod, Goodwyn was taken to receive medical treatment from

Nurse Woods. The treatment included cleaning and bandaging his left calf, where

he had a wound from a dog bite, and wiping his face with gauze and water.

30.     Goodwyn told the nurse that he was having problems breathing, but Nurse Woods

observed that he was talking without difficulty, was not in respiratory distress,

and that his oxygen was at 96%, which Nurse Deel testified was "good."

31.     Goodwyn spoke to investigator Murphy at or around this time and admitted that

he had been fighting and that he had used soap in a sock as a weapon.

32.     Goodwyn was exposed to fresh air while talking with Murphy.

33.     Goodwyn was then moved from the A-456 vestibule to the A-123 vestibule.

Throughout his transport, including in Murphy's presence, he continued to be

uncooperative with officers' commands. Specifically, although he was told to be

still and to keep his head facing forward, he in fact kept moving his head from

side to side and trying to jerk away from officers.

34.     No defendant or other officer slammed or rammed Goodwyn's face or head into a

doorframe. He was pressed against the wall by the door and held there using just

enough pressure to keep him there and to maintain control over him.

35.   Goodwyn was not bitten by any dog, controlled by Hayes or anyone else, at any point from the time he left the A-1 pod until he was placed in his segregation cell, including when he was being held against the wall in the A-123 vestibule.

36.   Goodwyn was eventually taken to the B-3 pod. To access that pod, he was transported outside from the A building to the B building.

37.   While escorting Goodwyn, Statzer did not at any time bend back Goodwyn's wrist in an attempt to cause pain. Statzer used an approved VDOC technique to maintain control over Goodwyn's hands as he was escorted.

38.   The Handheld Video does not reflect an improper use of force against Goodwyn by Statzer or Roberts. Instead, it appears that both officers are restraining his hands, but only insofar as is needed to maintain control over him and to keep  his hands under control as they were moved to the front of his body to be placed in ambulatory restraints.

39.   By the time he reached the segregation cell, Goodwyn had been removed from the area where the OC spray was used, had been exposed to fresh air at least twice, and at least a portion of his face had been washed with water and gauze. Thus, the effects of the OC spray were significantly lessened from the time of the initial contact.

40.   Goodwyn was not in significant distress or pain from the OC spray by the time he arrived at his segregation cell. He described the effect as not a "serious pain," but more of an "uncomfortable" feeling, like "not being able to breathe and not being able to do anything about it."

41.   Goodwyn did not ask to shower to have the OC spray removed.

42.  Goodwyn's segregation cell had a sink.  The restraints did not prevent Goodwyn from washing his face in the sink, had he tried to do so.  The water to his sink was on.

43.  Goodwyn was placed in ambulatory restraints while on his knees in front of his segregation cell.  His restraints were not improperly tight.  Nurse Deel checked Goodwyn's ambulatory restraints, and she verified to the camera during the Handheld Video and by her signature on a form that the restraints were properly applied and not too tight.  (*See* Defs.' Ex. 6.)

44.  The restraints allowed enough movement so that Goodwyn could have fed himself, reached his face with his hands, and reached the sink with his hands.

45.  Goodwyn has not proven that his restraints were improperly applied, or that any harm to his hands or ankles resulted from the restraints, although his wrists and ankles were swollen the following day after he was released from restraints.

46.  At approximately 3 p.m. on December 17, 2015, Nurse Woods was called to Goodwyn's cell to redress his wound.  Upon cleaning his left calf, she noted blood on his right leg and, upon examination, discovered three puncture wounds, which she described as a "dog bite."  (Pl.'s Ex. 6 at 1.)

47.  Goodwyn continued to be disruptive, albeit not continuously, while held in the ambulatory restraints, engaging in conduct such as cursing at staff and banging his restraints.  He was released from the restraints less than twenty-four hours after he was placed in them.

48.  None of the video offered into evidence at trial was edited or otherwise tampered with or doctored.  Goodwyn also failed to show that any other relevant video existed and had not been preserved.

37

B.      **Legal Conclusions**

To hold any of the defendants liable under § 1983 for using excessive physical force

against a prisoner like Goodwyn, Goodwyn must prove by a preponderance of the evidence "not

only that an assault actually occurred," but that the defendant acted "maliciously and sadistically

rather than as part of a good-faith effort to maintain or restore discipline," *Wilkins*, 559 U.S. at

40 (internal quotation marks omitted); *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986)

(explaining that, in order to resolve a claim that prison staff's excessive force violated the Eighth

Amendment, the court must determine whether the force applied was "in a good faith effort to

maintain or restore discipline or maliciously and sadistically for the very purpose of causing

harm").  Whether the force was necessary or intentionally aimed at inflicting unnecessary

physical harm depends on factors such as the need for the application of force, the relationship

between the need and the amount of force used, the extent of injury inflicted, the extent of the

threat to the safety of staff and inmates reasonably perceived by responsible officials, and any

efforts made to temper the severity of a forceful response.  *Whitley*, 475 U.S. at 321; *see Wilkins*,

559 U.S. at 34.

In assessing each use of force that I have found occurred, the above factors support a

finding that the force used was not excessive.  While in A-1 pod, some application of force was

necessary to get Goodwyn under control.  The use of the dog, the use of OC spray, and Messer

putting pressure on Goodwyn's shoulder to assist in restraining him were reasonable responses

by the officers, given the situation, in which both the safety of staff and other inmates at issue.

With regard to Adams's use of the OC spray, the Fourth Circuit has long held "that it is a

violation of the Eighth Amendment for prison officials to use mace, tear gas, or other chemical

agents," including pepper or OC spray, "in quantities greater than necessary" to maintain or

restore discipline "or for the sole purpose" of inflicting pain on an inmate. *Williams v. Benjamin*, 77 F.3d 756, 763 (4th Cir. 1996) (quotation marks omitted); *see Iko*, 535 F.3d at 240. Thus, as with any use-of-force claim, the determination as to whether it is excessive depends on whether it was used to maintain or restore discipline or, on the other hand, "for the sole purpose" of inflicting pain. In this case, I easily conclude it was the former.

I find credible the testimony of the officers, which is supported to a large degree by relevant portions of the RapidEye Video and some of Goodwyn's own testimony, that Goodwyn was not obeying orders to lie still on the floor with his arms out in front of him and his legs crossed. He ignored orders initially, and he did not immediately lie down when he was instructed to do so by Roop. Instead, he moved away from Roop and the other offenders. Even once he was lying down, he continued to move his legs, and he admitted that the video showed that he was not lying motionless. Also, the testimony of numerous officers, the incident reports from that date, and the video itself all support that Goodwyn was not being compliant or allowing himself to be restrained. Indeed, even after he was escorted out of the A-1 pod, he failed to comply with directives and was being physically "belligerent."

After numerous reasonable warnings, and given the fact that this was a potentially dangerous situation in which at least four offenders were involved in a violent altercation, and a large number of other offenders were out of their cells and not restrained, the force used was a reasonable attempt to gain control over Goodwyn so that order could be restored to the entire pod. It also is worth noting that the OC spray was used for a short time. All of this evidence shows that the force used was reasonably necessary to maintain order and efforts were made to temper the severity of the force used. Nothing about the use suggests it was done in an attempt to inflict pain.

The same is true as to the use of the dog.  At the time Roop engaged his dog on Goodwyn, Goodwyn was yelling and cursing at Adams and appeared to be trying to stand up. He was not restrained and had been fighting.  He was given multiple warnings, and repeatedly failed to obey the officers' commands.  At that point, the dog was a reasonable way to gain control over him.  As with the use of the OC spray, the dog was engaged for a short time (five seconds at most, according to Roop).  Moreover, the force being used to restrain Goodwyn ended immediately upon Goodwyn becoming sufficiently compliant that the officers could surround him without grave risk of injury.

The conclusion that the force used by Roop was not excessive is further supported by *Whitten v. Gunter*, 757 F. App'x 235 (4th Cir. Dec. 17, 2018).  In *Whitten*, the Fourth Circuit upheld a jury verdict in favor of a correctional officer who had released his dog on a prisoner who was fighting with another prisoner and who had ignored verbal commands to stop, and where two separate bursts of OC spray failed to stop the fighting.  757 F. App'x at 237–38.  The force used in *Whitten* was even more severe, in that the dog was released onto the prisoner and "first grabbed him by the head and then by the back, causing substantial injuries."  *Id.* at 236.

At the exact moment the dog here was used, Goodwyn was not fighting, but he had ignored repeated commands to stop fighting before that, he remained agitated, moving, and had just yelled (including swearing) at Adams, who had used OC spray on him.

Further, the situation in *Whitten* was more serious in some ways in that the two inmates were fighting in a cell and the K-9 officer saw "blood everywhere" when he instructed the control room officer to open the cell door.  Here, there were no obvious injuries and no one reported seeing blood.  But unlike in *Whitten*, where the fight was confined to a cell and only between two prisoners, such that there was likely no danger to staff, the factual situation here

was more dire in some ways.  All of the lower tier offenders were out of their cells, and multiple

offenders (at least four) were fighting.  There was a danger to other offenders and to officers who

were present.

The testimony of the control room officer, Clevinger, emphasized this point.  As he

explained, once the K-9 officers arrived and other officers were trying to restrain the fighting

offenders, he had to maintain a vigilant watch over other inmates, to ensure that the disturbance

was not a ruse to be able to carry out an attack on an officer or officers.  (Trial Tr. 296.)  Until all

the offenders were complying and/or restrained, danger to staff and to other prisoners persisted.

And by the accounts of all officers, Goodwyn was either fighting, yelling, or moving, and not

complying with orders throughout the two-minute period that the incident lasted.

Accordingly, I conclude that both Adams and Roop deployed force reasonably to control

an inmate who had been fighting and had not obeyed commands of the correctional officers.

Given the repeated efforts to get Goodwyn to stop fighting and to comply by lying still on the

ground, the evidence supports the finding that both Adamas and Roop used force in a good faith

effort to restore discipline rather than maliciously and sadistically to cause harm.  The quick

burst of OC spray was not excessive in this circumstances, nor was the brief engagement of a

dog on Goodwyn's leg or legs.

The same is true of Messer's pressing down with his knee on Goodwyn's shoulder.  It

was a minimal use of force in response to Goodwyn's non-compliance and kicking evident on

the video.  It lasted a short time and clearly ended as soon as the officers were able to get

Goodwyn in restraints.

Similarly, pressing Goodwyn against the door in the A-123 vestibule and holding him

there firmly until it was time to transport him was a reasonable use of force to control him, as

was holding his wrist during the escort and immediately prior to placing him in the ambulatory restraints. The force used was an approved VDOC technique that allowed the officers to maintain control over Goodwyn while being transported, and in transitioning his hands to ambulatory restraints. Had Goodwyn been compliant throughout the transport, these uses of force might not have been necessary, but numerous witnesses credibly testified about his continuing belligerent conduct and refusal to be still and face forward as he was directed to do. Thus, I conclude that these uses of force, too, were a reasonable, good-faith effort to obtain or maintain control of Goodwyn, so as to safely escort him, without injury to him or staff.

As to Goodwyn's claims against Franklin, who made the decision to place Goodwyn in ambulatory restraints, that decision did not constitute an Eighth Amendment violation, whether analyzed as an excessive force claim or an unconstitutional conditions claim. Construed as an excessive force claim, Goodwyn's claim fails because he has not shown that any force beyond "nontrivial" force was used. In particular, he has not alleged or shown that he had any resulting injuries, other than swelling.[18]

As recognized by the presiding judge, other judges of this court have held that the "temporary use of ambulatory restraints, even if the inmate no longer was disruptive, did not constitute excessive force given the de minimis nature of the inmate's injuries." *Canada v. Mathena*, No. 7:13-cv-00322, 2014 WL 3748300, at *4 (W.D. Va.), *aff'd*, 589 F. App'x 121 (4th Cir. 2014) (citations omitted). Here, Goodwyn was disruptive and non-compliant not only during the incident and in refusing to be restrained, but also during his transport. Moreover, the fifteen-minute watch sheets and logs reflect that he continued to engage in disruptive behavior while in the restraints. As in *Canada*, Goodwyn's minimal injuries suggest that the use of

---

[18] As noted, I find that the restraints were properly applied. It is unclear what caused the swelling or whether Goodwyn's behavior in banging his restraints contributed to that swelling.

ambulatory restraints was de minimis force that did not trigger the Eighth Amendment. Other cases are in accord. *E.g.*, *Smith v. Davis*, No. 7:10-CV-00263, 2011 WL 3880944, at *4 (W.D. Va. Sept. 1, 2011) (granting summary judgment in defendants' favor as to excessive force claim based on inmate's being held in ambulatory restraints for approximately twenty-one hours because their use did not rise to the level of force that is "repugnant to the conscience of mankind") (citation omitted).

The fact that Goodwyn was not permitted to shower before being placed in the restraints does not require a different result. Even if he had made a request to shower, which he has not shown, I find that it was reasonable to not allow him a shower prior to placing him in the segregation cell. First of all, Goodwyn had been evaluated by a nurse for breathing issues long before being placed in the restraints and found to be in no distress. Goodwyn even admitted that he was not in significant pain from the OC spray by the time he reached B-3. Moreover, several of the officers presented reasons why additional decontamination (beyond removing him from the pod where the spray was used and getting him out in the fresh air), could not be utilized at that time. In particular, a risk to officers existed from placing an inmate in a shower space where that inmate continued to resist and was being combative with staff. Lastly, I find that Goodwyn had access to water in his cell and physically could have washed his face while in the segregation cell.

Goodwyn has not shown facts sufficient to establish the subjective component of an excessive force claim, either. Goodwyn's continued non-compliance and kicking at staff suggests that his placement in restraints was a good faith effort to maintain or restore discipline. Moreover, his continued disruptive behavior while in the restraints justified their continued use for that twenty-four hour period. *See Battle v. United States*, No. 3:13-CV-58, 2014 WL

2807651, at *8 (N.D.W. Va. June 19, 2014) (noting that where plaintiff initially was non-compliant and continued to be disruptive after being placed in ambulatory restraints, the decision to keep him in the restraints for 26 hours was "a rational, measured response to the risk that he would continue to be disruptive or destructive") (citation omitted).

Similarly, to the extent his claim concerning the restraints is more properly analyzed as a conditions claims, it also fails. This is true whether brought against Franklin or Kiser, to whom Goodwyn allegedly complained about not being permitted to shower and who did nothing in response. As noted previously, a conditions claim requires the plaintiff to identify a significant or serious injury or risk of injury. *Shakka*, 71 F.3d at 166.

Here, Goodwyn alleged that he was uncomfortable, but the evidence shows that he had the ability to use water to decontaminate further. And while the nurse noted some swelling upon his release from the ambulatory restraints, other courts have held that similar types of pain, soreness, or discomfort are insufficiently serious to support the objective component of an Eighth Amendment claim. *See James*, 2017 WL 193494, at *5 (holding that prisoner left in ambulatory restraints for approximately eleven hours, who could not defecate while in the restraints, failed to state a sufficient injury for a conditions-of-confinement claim; allegations of "physical discomfort, exacerbated pain, muscle spasms, anguish, humiliation, resulting soreness and depression" were insufficient); *Holley*, 2010 WL 2640328, at *13 (reasoning that "severe muscle pain and stiffness lasting for ten days," where plaintiff had the ability to change position, and an injury to his wrist from the handcuffs, which did not require medical treatment and subsided completely within days, did not render the use of ambulatory restraints for a 48-hour period, even in a cold cell, an Eighth Amendment violation). For all of these reasons, defendants are entitled to judgment in their favor as to the ambulatory restraint claim.

As noted in the findings of fact section, I conclude that the remaining alleged uses of force did not occur, and thus Goodwyn's claims based on them fail.  These include Adams's alleged kicking, slamming Goodwyn into a door frame, Hayes's engaging his dog on Goodwyn, and the improper bending of his wrists.  I also have expressly found that his ambulatory restraints were not too tight.

Additionally, because there was no unconstitutional use of force, defendants are entitled to judgment in their favor as to all of the bystander liability claims, *Thomas v. Holley*, 533 F. App'x 208, 221 (4th Cir. 2013), and as to Goodwyn's state-law torts, *Johnson v. Dep't of Alcoholic Beverage Control*, No. 3:15-CV-00055, 2016 WL 7235836, at *8 (W.D. Va. Dec. 13, 2016).

## IV. CONCLUSION

Goodwyn has not shown by a preponderance of the evidence that any of the physical force used against him, or his placement in ambulatory restraints, violated his Eighth Amendment rights.  I recommend that the court rule that defendants are entitled to judgment in their favor as to all claims and dismiss the action with prejudice.

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is

directed to transmit the record in this matter to the Honorable Norman K. Moon, Senior United States District Judge.

    The Clerk shall send certified copies of this Report and Recommendation to the parties.

    ENTER: July 23, 2020.

Joel C. Hoppe
United States Magistrate Judge